## Forman, et al. v. Mutual Life Insurance Company.

(Decided January 30, 1917).

### Appeal from Fayette Circuit Court.

1. Insurance—Life Insurance—Effect of Paper Attached to Policy.— Where an insurance company, to induce a prospective patron to accept its policy, attached to it a paper styled "illustration," which contained the promise to pay a specific sum at the expiration of twenty years, and on the faith of the promises contained in this "illustration" so attached and the belief of the patron that he would get the amount stipulated in the "illustration," he accepted the policy, the company became bound to pay him the amount mentioned in the "illustration."

2. Insurance—Life Insurance—Papers Made Part of Policy.—Where a person desiring insurance was shown by the agent a paper illustrating what the company would pay him in options at stated

periods, and he refused to accept the policy until this paper was made a part of it by some principal officer of the company, the paper, when physically attached to the policy by one of the principal officers of the company, became a part of the contract, and the policy contract proper and the paper should be read as one contract.

3.  Insurance—Life Insurance—When Advertising Paper Becomes Part of Policy Contract—Effect of.—When an authorized agent of an insurance company attaches to the policy, or without physical annexation by his representations or assurances makes a paper by whatever named called a part of the policy contract, and on the faith of the assurances in this paper the insured is induced to accept the contract, the paper becomes a part of the policy contract and the company is bound by its stipulations.

4.  Insurance—Life Insurance—Construction of Contract.—If there is reasonable doubt as to the meaning of the contract, that construction should be adopted that will carry out the understanding of the insured as to the meaning of the contract at the time he accepted it, if it is fairly made to appear that his understanding of its meaning was produced by and based on representations and assurances of the company before or at the time the contract was executed, and these representations and assurances were of such a nature as to reasonably induce the insured to believe that his understanding and construction of the contract would be carried out.

HOBSON & HOBSON, MATT WALTON, JOHN B. SHANNON and M. DON FORMAN for appellants.

FREDERICK L. ALLEN, GEORGE R. HUNT; GRUBBS & GRUBBS, CHAS. S. GRUBBS and RODMAN S. GRUBBS for appellee.

OPINION OF THE COURT BY JUDGE CARROLL—Reversing.

On April 16, 1892, the Mutual Life Insurance Co., by its policy of that date, insured the life of the appellant, T. T. Forman, for two thousand dollars, the policy being payable to his wife.

The policy contained this clause: "This policy is issued on the twenty-year distribution plan. It will be credited with its distributive share of surplus apportioned at the expiration of twenty years from date of issue. Only twenty-year distribution policies in force at the end of such term, and entitled thereto by year of issue shall share in such distribution of the surplus; and no other distribution to such policies shall be made at any previous time. All surplus so apportioned may be applied at the end of such period to purchase an annuity or may then be drawn in cash." . . . .

Forman kept the policy in force until April 16, 1912, twenty years after the date of its issual, at which time he was notified that the surplus dividend on his policy was $518.28, and that he could either draw this amount in cash or could select any one of the several other equivalent options provided in the policy. Forman elected to receive the surplus dividend in cash and accordingly the sum of $518.28 was paid to him, with the stipulation that it should not prejudice his right to recover from the company the difference between the amount received and $996.08, the amount he claimed. The company declining to pay the amount claimed by Forman as cash surplus, viz.: $996.08, he brought this suit to recover the difference between $518.28 and $996.08, and the lower court having dismissed his petition, he prosecutes this appeal.

Forman insists that he is entitled to the difference between the amount paid and the amount claimed, upon the ground that the company, at the time the policy was delivered to and accepted by him, guaranteed that the surplus dividend at the expiration of twenty years would be $996.08, and upon the further ground that, on a fair accounting of the surplus to which his policy was entitled, he would receive the sum claimed by him.

As we have reached the conclusion that Forman is entitled to the relief sought, upon the ground that the company guaranteed as a part of the contract of insurance that it would pay to him as surplus earned by his policy at the end of twenty years, $996.08, we do not find it necessary to enter into a consideration of the question whether a fair accounting would show him entitled to $996.08 or any larger sum than the company paid.

Forman in his deposition says that Dr. H. D. Rodman, who was then an agent for the company, solicited him to take out a policy in the company, and as an evidence of the inviting qualities of the policy, submitted to him an "illustration." This "illustration" consisted of two pages; on one was some illustrated matter and the signature in writing of F. Schroider, Assistant Secretary, attested by the seal of the company, and on the other was the following printed and written matter:

Age 39.     Please endorse as correct.      Prem. $62.20.

## ILLUSTRATION

T. T. FORMAN

### No. 496,382

### Income Life Policy

### Par Value, $2,000.00.

### Reserve, $681.14.

This form of contract is new and original in its essential features. Under it the policy-holder has several options of settlement, or continuances, as below stated. The cash and equivalent values include the legal reserve, the amount of which is specifically guaranteed, and the surplus. What this surplus will be in future settlements will necessarily depend upon subsequent experience. The surplus incorporated with the cash value or equivalent options in this example is to be understood as an adapted illustration based upon actual experience in policy settlements of recent date.

### OPTIONS AT THE END OF 20 YEARS.

| 3 A | $1,677.14 In Cash | **"A"** To draw in cash the entire reserve with the accumulated surplus. |
|---|---|---|
| 12 B 3 | $58.70 Annual Income and $1,677.14 At Death. | **OR, "B"** To draw as annual income for life, and continue the sum of the reserve and accumulated surplus as paid-up insurance, participating in future dividends, and payable at death. |
| C5 | $3,554.00 At Death. | **OR "C"** To add the insurance value of accumulated surplus to the amount of the original insurance and continue the combined amounts, as participating insurance, by payment of the original premium only. |
| 2 D7 | $996.08 Cash Surplus or $100.00 Equivalent Life Income and $2,000.00 At Death. | **OR "D"** To draw accumulated surplus in cash, or as an equivalent life income, and continue original insurance, participating in dividends, by payment of original premium. |
| 6 E 9 | $168.38 Income After One Year, or $445.96 Income After Ten Years. | **OR "E"** To buy a one-year deferred, or a ten-year deferred, income with the total cash value. |

He further testifies that he was attracted by the options set out in the "illustration," and said to Dr. Rodman "that this illustration appeals to me, and after conference with him the result of it was that I informed him that if he would have the illustration which he presented to me approved by some general officer of the company, I would take out the policy. He agreed to this, and while perhaps there was nothing said in the application with reference to the illustration being made a part of the policy, I had Dr. Rodman's agreement that it should be so approved and attached to the policy and he made his word good.

"At the head of the illustration in pencil memorandum, which I believe to be in the handwriting of Dr. Rodman, are these words, now quite indistinct with age, as follows: 'Please endorse as correct.'

"I believe that to be the identical paper which was filled in by Dr. Rodman as the defendant's agent, and believe that it is the identical paper sent by Dr. Rodman, as agent, to the defendant, along with the application which I made for insurance in defendant company. When the policy was returned to me that illustration was dated, as I read it, the same date with the policy, and it was physically attached to the policy when the same was delivered to me by Dr. Rodman as the contract of insurance with the company. It was attached by mucilage or paste to the policy.

"I desire to call attention to the fact that the illustration is signed 'F. Schroider, Assistant Secretary,' whose name is signed to my policy contract and his signature to the policy appears to be in the same handwriting as the signature of F. Schroider, Assistant Secretary, on the illustration. Therefore, I believed at the time, and believe now, that I was getting the approval of the illustration by a general officer, or two general officers, or three general officers of the defendant company. I say three because there are some cabalistic signs 'Correct, J. W.' on the back of the illustration, that I have never been able to figure out, but it looks like somebody who had authority to handle such papers had endorsed it correct besides Stewart and Schroider. It is perhaps needless for me to say, but I do state it, and it is a fact, that the representations made to me by Dr. Rodman and approved by these officers of the company, and the contents of the illustration induced me to take out this contract of insurance."

On cross-examination he was asked and said: "Q. Subsequent to the application being made by you the policy came back from New York and was delivered to you by Dr. Rodman? A. I think that is right. I am sure it is. Q. You have testified to the fact that the paper called 'an illustration' in your suit and in this action was fastened to the policy by mucilage? A. I have. Q. You don't know when that was done, do you? A. I do not. Q. In other words, you are not advised as to whether that illustration was pasted on the policy at the home office, or at the office in Lexington? A. I only know that it was physically attached to the policy when it was delivered to me by Dr. Rodman in Lexington, Kentucky. I never saw the policy until it was so delivered."

On further examination in chief he was asked and said: "Q. I will ask you if the illustration blank which you testified was attached to the policy at the time of its delivery to you was not exhibited to you by the agent of the company, who solicited the insurance, prior to the time that you signed the application? A. I have so testified and believe that those figures are Dr. Rodman's figures filling in the blanks, and that it was sent on and I believe stamped in New York, and was undoubtedly attached to the policy and delivered to me on or about the middle of April, 1892. Q. I will ask you whether or not you requested Dr. Rodman, as agent of the company, before you accepted the policy which was issued upon the application, to forward the figures which he had made and which appear upon the illustration, to the company for its approval? A. I did, and as I recall, it was made a condition precedent to my taking the insurance. Q. Do you recall any conversation with Dr. Rodman at or about the time of the delivery of the policy, or previous thereto, in which he said to you, in substance, that he had submitted the illustration to the company and it had been approved? A. I don't remember that because the illustration came back along with the policy. Q. With the marks and notations which now appear upon it? A. That paper is absolutely unaltered except as it may have become obscure by age from the time it was attached to that policy until the present day."

Dr. H. D. Rodman testified, but there is no conflict between his evidence and that of Mr. Forman as to

what transpired when the policy was being solicited or afterwards, or in regard to the circumstances related by Mr. Forman in respect to the paper called "illustration." Dr. Rodman further said that in soliciting insurance agents of the company at that time did use such papers as this "illustration," but he also expressed the opinion that they were not a part of the contract of insurance.

In order that the issue upon which we propose to rest our decision may be clearly understood, it may be well to briefly restate the evidence on the subject of this "illustration" and the contentions of the respective parties to this litigation. We think the evidence shows in a very satisfactory way that Mr. Forman was induced to take the policy of insurance upon the faith of the representations as to what options he would have the benefit of at the expiration of twenty years as they were stated in the paper that will be called "illustration," and, furthermore, that he declined to take out a policy until this "illustration" was approved by a general officer of the company at the home office in New York and physically attached to the policy. He was not willing to accept the representations of the soliciting agent as to the correctness of the statements set forth in this "illustration," nor was he willing to consent that this soliciting agent might attempt to make this "illustration" a part of the policy contract. He wanted to be sure that this "illustration" was approved by some authorized officer of the company and made a part of the policy contract under the direction of some authorized officer, and so the "illustration" was sent by the soliciting agent to the home office of the company in the city of New York, and its authenticity was vouched for by the signature in writing of the assistant secretary of the company at the home office, the same person whose signature, in the same handwriting, appears on the policy contract, with the seal of the company attached to it.

It is also a fair assumption that at the home office of the company the "illustration" was physically attached to the policy contract at the time its verity was attested by the assistant secretary. After this was done, and when the policy contract with the "illustration" physically attached to it, subscribed to and attested in the manner indicated, was presented to Mr. Forman, he accepted the policy.

Upon this state of facts it is insisted in behalf of Forman that this "illustration" became and continued to be a part of the policy contract, as much so as if what it contains had been incorporated in the policy contract itself; or, in other words, that the "illustration" and what may be called the policy contract proper are to be treated as one contract and the rights of the parties determined from a consideration of these two papers, looking at them as one contract and the only contract between the parties.

On the other hand, the argument for the company is that the "illustration" is not and never was a part of the contract of insurance. That it was only an advertising illustration of what the company believed the options would amount to at the end of twenty years. It is a further argument that even though the "illustration" should be treated as a part of the contract of insurance, it does not constitute a guarantee or promise that the amounts mentioned therein would be paid to the policyholder at the end of twenty years.

In considering first the question whether this paper designated as "illustration" is to be treated as a part of the contract of insurance, we have been furnished with much authority in support of their respective contentions by opposing counsel, but none of the cases relied on develop states of fact like those appearing in this record as we have set them out.

The case of Southern Mutual Life Ins. Co. v. Montague, 84 Ky. 653, was a suit by Montague, a policyholder, to compel the insurance company to issue to him a paid-up policy. The company resisted this suit upon the ground that the policy contract did not obligate it to issue such a policy. In avoidance of this defense, Montague relied upon a pamphlet issued by the company setting forth what it would do, including the issual of the character of policy demanded by him. In considering the effect of this pamphlet, which was held by the court to be binding on the company, the court said:

"At the time the general agent of the company solicited the insurance from the appellee, he presented and delivered to him a pamphlet issued by the company, with the names of its officers and executive committee indorsed upon it, setting forth the nature and advantage of life insurance, and particularly in the

Southern Mutual Life Ins. Co. . . . . This pamphlet reads: . . . . 'Those desiring to discontinue payments of the annual premiums may, after the payment of *four annual premiums* on the life plan, or two on the ten-year or endowment plans, dispose of their policies to the company, in which case they will receive the equitable value, either in cash, or a policy of insurance will be issued for a fixed sum, payable at death.'

"This plan of insurance the company, through its chief officers, presented to the people of the state, by its authorized agents, with insurance policies drafted in the manner and form as the one delivered to the appellee. It is not pretended that any part of this pamphlet was embodied in the insurance policy, but it is alleged by the appellee that it was represented by the agent of the company that the stipulations in said pamphlet formed a part of the contract, and that after the payment of the premiums, four in number, the policy could not be forfeited to the extent of the payments made. The appellee paid nine premiums and failed to pay the tenth, and it is now claimed that he is not entitled to a paid-up policy because the verbiage of the pamphlet was not embodied in the policy. The fact of the exhibition of the pamphlet, and the representations made by the company's agent, which are admitted by the appellant, and established by the testimony of the agent whose duty it was to solicit subscriptions upon the representations contained in it, made that a part of the agreement. . . . . The printed pamphlet was not only the inducement, but formed a part of the consideration for which the premium notes were executed and the contract entered into by the assured. The rights of the assured under it was the prime cause for his accepting the policy, and gave the appellant as an insurance company, as it maintained, the preference over all others, and to hold that it was not intended as a part of the contract would be sustaining a fraud that no court of conscience could sanction."

In Equitable Life Assurance Society v. Meuth, 145 Ky. 160, privileges endorsed on the back of the policy in pencil writing, which were testified by the insured to have been in the policy when he received it, were held to be a part of the policy contract, although there was no reference in the printed or written parts of the policy

contract to these figures; and the court said: "When the president signed his name on the face of the policy, with his name printed under what was signed on the back of the policy, he made the whole policy the contract of the company."

In Timlin v. Equitable Life Assurance Society, 141 Wis. 276, the facts were these: Timlin took out a policy of insurance in the Equitable Society for one thousand dollars on the twenty-year plan. There were certain options allowed the insured in the body of the policy, and there was attached to the policy by a pin a small sheet on which there was certain printed and written matter. This paper was very much like the "illustration" in this case and set out the amounts that the insured would get at the expiration of twenty years in selecting one of the options described in the policy. At the expiration of twenty years the insured elected to accept the benefits of one of the options mentioned in the policy and the Equitable Society offered to pay him the amount of the option according to its method of calculating the amount due. The insured refused to accept the proposition and insisted that he was entitled to the amount stipulated for in the paper pinned to the policy. In the opinion the policy proper was described as "A," and the paper attached was described as "B," and the question for decision in the case was whether the paper "B" was a part of the policy contract "A." In disposing of the case the court, in the course of the opinion holding that the paper "B" was a part of the contract, said:

"In the light of the facts and circumstances shown, plaintiff's possession and production of pages "A" and "B" sufficiently establish that they were transmitted to him by the defendant in carrying out the negotiations for the contemplated life insurance policy. It is, however, averred that the fact of such delivery of page "B" is no proof that the statements therein are a part of the insurance contract made by the parties. True, such delivery in itself is not proof conclusive that the writing on this page embraces a part of the contract, but such fact, in connection with the other facts of the transaction, has a material and significant bearing, and tends to show that the contents of this page "B" embody a part of the negotiations had between the parties and that they are expressed in the writing.

"It is argued that the provisions contained in page 'A' show that it was understood and stipulated that this sheet embraced the whole contract, and therefore the page 'B' is excluded therefrom. Stress is placed on the provision that 'the contract between the parties hereto is completely set forth in this policy, and the application therefor, taken together, and none of its terms can. be modified, . . . . except by an agreement in writing,' signed by one of the authorized officers. There is nothing in this provision excluding page "B" from being a part of the policy, for the question remains: What, under this provision, constitutes the policy? Plaintiff asserts that it consists of the agreement set forth on pages 'A.' and 'B,' while the defendant claims that page 'A' alone covers it. We do not consider that the words 'this policy,' as used in this provision, restrict it to page 'A.' The term as here used is applied to the contract made by the parties, and in this connection embraces the agreements of the parties, whether embodied in page 'A' or in both pages 'A' and 'B.' . . . .

"Viewing the pages 'A' and 'B' in the light of their contents, we find that they obviously treat of the same subject-matter, and that the various provisions are in accord and are harmonious and mutually complementary. It is manifest that the agreements of page 'B' make definite and certain what was left indefinite in the fifth paragraph of 'provisions and requirements' of page 'A.' This seems a most natural and reasonable thing for a person to do in negotiating for life insurance. The all-important questions for the applicant are the amount of the premiums and the financial value of the contract at its maturity. And so, here, it is evident that the plaintiff sought to purchase insurance that would yield him definite financial returns, and that the defendant company stipulated that the contract would yield the amounts specified in page 'B' if it should be in force at the end of the tontine period."

In Tourtellotte v. New York Life Ins. Co., 155 Wis. 455, the question was whether a paper not attached to the policy but delivered with it in the mail should be treated as a part of the contract as it was set forth in the policy. This statement, which was delivered to the insured with the policy, made definite and certain the amount that the insured would receive upon his election

to accept the benefit of options described in the policy, and is very much the same character of paper as the "illustration" in this case. In holding that the paper accompanying the policy did not guarantee the payment of the amount specified therein, the court said:

"The statement purports to do nothing but illustrate or explain the contract. It contains no words of promise or guaranty."

It then proceeded to distinguish this case on the facts from the Timlin case, by saying that in the Timlin case: "It was held to contain words of promise as to the amount to be paid, while here we have language which purports only to 'illustrate' the policy, and which states the source of the figures upon which the illustration is based." And further said that Tourtellotte understood when he accepted the contract that he would only get at the end of the option period his equitable share in the surplus and not the sum set forth in the paper. The essential difference between that case and the one we have consists in the fact that here the "illustration" was attached to and made a part of the contract, and Forman in accepting the policy understood that when the option period arrived he would have the right to select one of the amounts specified in the "illustration." A further material difference grows out of the fact, which we will presently endeavor to establish, that the "illustration" was a guarantee to Forman that he would receive the amounts therein specified.

In Untermyer v. Mutual Life Ins. Co. of New York, 113 N. Y. Sup. 221, a controversy arose between the insured and the company as to whether a paper delivered with the policy by the soliciting agent of the company should be treated as a part of the contract of insurance, and the court, in holding that it should not, said: "The policy bearing the signature of the officers of the company and its promise to pay, contained no promise as to this future speculative result, but did bear in emphatic terms a notice to the holder that no agent had power on behalf of the company to make or modify this or any contract of insurance to extend the time for paying a premium, to bind the company in making any promise, or by receiving any representations or information not contained in the application for this policy.

"The whole claim of the plaintiff is based upon the contemporaneous writing signed by the soliciting agent

and called an 'illustration;' her contention being that that paper, signed by the agent, because it was upon a blank furnished by the company and was delivered to the insured at the same time with the delivery of the policy, was, in spite of and in the face of the warning and notice contained in the policy itself, nevertheless the act of the company and binding upon it as its direct promise.

"We hold upon this statement of facts that this paper was a mere presentation by the soliciting agent of the hoped-for results based upon the past experience of the company, that he had no power to make it as a binding contract of the company, and that the company is not affected by it."

It will be observed in that case that the decision was put upon the ground that the paper relied on by the insured was a mere presentation by a soliciting agent who had no power to make it a binding contract on the company, and so the difference between that case and the one before us is obvious.

In McIntyre v. The Cotton States Life Ins. Co., 82 Ga. 478, the question was whether a prospectus issued by the company and used by its agents in procuring insurance should be treated as a part of the contract and binding on the company, and the court held that it should not.

In Grange v. Penn Mutual Life Ins. Co., 235 Penn. St. 320, the insured relied on a statement of estimates given to him by an officer of the company pending the negotiations for the policy, claiming that the "estimates" of the options that he had the privilege of electing to have at the end of a certain period set forth in this estimate induced him to take the policy, and, therefore, the company was obliged to give him the benefit of the options set forth in the estimates; but in holding that the insured could not have the relief sought on this ground, the court said:

"Counsel for appellant contends that these statements of the assistant secretary of the company were misrepresentations of material facts, and that the company should be held responsible to him in damages for the deceit which he alleges was practiced. But with respect to this matter the trial judge found that the evidence of misrepresentation was not sufficiently clear, precise, and indubitable to demand a reformation of the

policy, and that the misrepresentations were concerned with matters which were the subject of estimate merely, and not of concrete fact, and, therefore, they do not support the appellant's allegations of fraud in the making of the contract. He further held that it was not within the power of the assistant secretary to bind the defendant company by any representation, in such a manner as to give to the plaintiff any advantage over other policyholders in the company. The court also found that the representation made by the assistant secretary that the estimate was based on the past experience of the company did not constitute such deceit as would justify a recovery of damages by appellant, or would entitle him to an accounting by the company. These conclusions seem to us to reasonably follow from the evidence concerning the matter in question." It will thus be seen that in that case the insured sought relief upon the ground of fraud and deceit practiced on him in the procurement of the policy and the relief was denied because the evidence was not sufficient to support it.

In Williams v. New York Life Ins. Co., 122 Md. 141, 89 Atl. 97, there was pasted on the policy a typewritten statement setting forth the amount that would be paid the insured on the expiration of the accummulation period; and the question in the case was whether the company was bound by the figures contained in this slip. In considering the effect of this slip and in holding that the company was not bound by its contents, the court said that this question depended upon "whether or not the slip pasted on it, already quoted, was a part of the contract between the parties, and if it was, what effect, if any, did it have upon the policy itself?

"It is to be noted at the outset that the slip is neither signed nor initialed, nor is there anything upon it to indicate that it was, or was intended to be, any part of the contract. Where or how it originated is not shown by the evidence. Dr. Williams testifies that the only time he ever saw the policy was when Mr. Howland delivered it to him, and that at that time it had the typewritten slip pasted on the third page; but he further testifies that that is what he relied on in taking out the policy, those figures. This is a manifest impossibility. The insurance was taken out in July, and the policy was not made out until October. He could

not then have relied, in taking out this insurance, upon something which had no existence until three months later.  But he further says, and this is probably what he means, that the agent who solicited the insurance made him certain representations as to figures, and that this slip corresponded with the representations made to him.  Whatever the representations may have been, they were merged in the contract.  The mere fact of the fastening of the slip to the policy could not make it a part of the contract, where there was no reference on either policy or slip of the one to the other.''  It will be noticed that the court put its decision upon the point that the slip was neither signed nor initialed, nor was there anything to indicate that it was intended to be a part of the contract, thus plainly distinguishing it from the case we have.

In Provident Savings Life Assurance Society v. Withers, 132 Ky. 541, in a litigation with the assurance society as to the meaning and effect of the contract of insurance, the insured relied upon a paper styled an ''illustration'' and claimed that the assurance society by fraud or mistake had not delivered to him a contract that contained the stipulations set forth in the ''illustration,'' upon which stipulations he relied.  It appears from the opinion that the soliciting agent at the time he delivered the policy gave to the insured the ''illustration'' which was signed by the agent.  In holding that the ''illustration'' was not binding on the company, the court said:

''Withers accepted his policies when the company sent them to him.  He could have told by the simplest inspection whether they conformed to the contract Johnson had made with him.  He kept the policies until he brought this suit on October 17, 1906, or about seven years after the policies were delivered to him.  He cannot now say that he has not accepted the policies, for he kept the policies and regularly paid the premiums.  By the statute the policy is the sole measure of the company's liability.  We have held in several cases that nothing outside of the policy such as the application or other prior contract can be pleaded by the company to modify its liability under the contract.  The statute is for the protection of both the company and the policyholder.  Preliminary contracts previous to the issual of the policy can be shown by neither to defeat its opera-

tion. . . . . The plaintiff cannot have relief under the special contract relied on because that was merged in the policies, and he cannot now have the policies corrected for fraud or mistake because the action is not brought within five years after the perpetration of the fraud or the making of the mistake, and after he knew or by ordinary diligence should have known it. He had the policies. He could have looked at them at any time. He cannot accept them, and, after keeping them for seven years, and after the time has expired within which he might have had the policies corrected for fraud or mistake, have relief in equity. To do this would be to encourage or reward supineness, and it would be to establish a rule that would destroy the value of written contracts.''

Another illustrative case is Langdon v. Northwestern Mutual Life Ins. Co., 199 N. Y. 188, in which a divided court held that the insured was not entitled to a reformation of his policy to conform to the stipulations in a paper entitled ''a special contract;'' putting its decision upon the ground that the special contract was understood to be no more than a prospectus and upon the further ground that the insured by his laches had deprived himself of the right to ask a reformation.

A discussion of the question before us may also be found in Bliss on Life Insurance, page 612, and Cooley's Briefs on the Law of Insurance, vol. 1, page 662.

Many other cases have been examined, but it would extend this already lengthy opinion beyond reasonable bounds to give extracts from the numerous cases on the subject. It is sufficient to say that no one that we have cited or examined presents as strong reasons for holding the ''illustration'' to be a part of the policy contract as do the facts in the case we have. In the cases holding that slips, prospectuses, illustrations and other like papers sought to be made a part of the policy could not be so treated, it will be generally found that this conclusion was reached because the paper relied on was either signed by some unauthorized agent of the company, or was not attached to the policy, or was understood not to be a part of the contract, or was not relied on by the insured. But in this case the ''illustration'' was signed by one of the chief officers of the company; it was physically attached to the policy; it was the inducement offered by the company to Forman why he

should accept the policy, and set forth the reasons that caused him to accept it, and he understood that this "illustration" was a part of the contract. No person of ordinary intelligence, receiving a policy under the circumstances Mr. Forman accepted this one, would have any reasonable doubt that the "illustration" was intended to be and was a part of the contract. Nor can there be any reasonable doubt that the company intended he should so believe.

Another question is, does it contain express or implied stipulations binding, or that should be construed to bind, the company to pay the cash surplus of $996.08 mentioned in the "illustration?" Counsel for the company say it does not; that even if it should be treated as a part of the contract, it was no more than an agreement that the company would set apart to this policy such an amount of surplus as the policy was entitled to; or, in other words, the "illustration" and the policy when read together or separately mean in respect to this matter the same thing and neither contains a promise or guarantee that the company will pay any certain sum.

Let us see now by comparison of the application, the policy and the "illustration" if the "illustration" promised to do no more than the policy, or should be so construed. The application signed by Forman recites that: "I further agree that in any distribution of surplus the principles and methods which may be adopted by the company for such distribution and its determination of the amount apportioned to such policy shall be and are hereby ratified and accepted by me," and the policy stipulated: "It will be credited with its distributive share of surplus apportioned at the expiration of twenty years from the date of issue." So that neither in the application nor in the policy is there any statement as to the amount of surplus that would be apportioned to the policy. The matter of distribution and apportionment was left by the terms of these papers to the good faith and honesty of the company. But when we turn to the "illustration" we find, in option "D," under the head of "options at the end of twenty years," that he should have the right "to draw accummulated surplus in cash, . . . . $996.08 cash surplus."

It is very true that this "illustration" also recites that: "What this surplus will be in future settlements will necessarily depend upon subsequent experience," and further states that: "The accompanying figures are correct as an illustration based upon the experience of the company." But if the company did not intend to practice a fraud on Forman or to deceive him—and it is urgently insisted that the company did not intend to do either—what was the purpose in making a part of the contract this "illustration" and specifying in it that he should have the option at the end of twenty years "to draw accummulated surplus in cash, . . . . $996.08"? The policy contract provided that he should have the surplus apportioned to his policy at the end of twenty years but did not specify what the amount of the surplus would be, and this is what Forman wanted to know. This is why he demanded the "illustration," plainly setting forth the amount he could draw, and, manifestly, the company should not be permitted to say that the figures $996.08 are meaningless, or that they are a mere estimate, because to allow it to escape liability on this ground would be to assume that it did endeavor to deceive and defraud Forman. Any reasonable man of average intelligence would understand from reading the "illustration" that at the end of twenty years he would get $996.08. This is the only fair construction of which the "illustration" and the policy when read together are susceptible. And this is manifestly the construction the company intended Forman should put on the "illustration" when read with his policy. It was the belief that he would get $996.08 that induced him to accept the contract, and the company attached the "illustration" to the policy to satisfy Forman on this vital point. It knew as well as he did that the policy did not give him the definite assurance that he wanted, and so to make certain this indefinite condition in the policy, it made the "illustration" a part of the contract for the sole purpose of guaranteeing to Forman that at the end of twenty years he could get $996.08. This is the only fair and honest theory upon which the conduct of the company in attaching the "illustration" to the policy can be explained.

We prefer to adopt this view rather than assume that the company was attempting to practice a fraud

on or deceive Forman by inducing him to accept the policy on the faith of the assurance that at the end of twenty years he could draw $996.08 in surplus, when it did not intend to pay him this amount, because it is perfectly plain that the company by this "illustration" either intended to pay Forman at the end of twenty years $996.08 or it intended to deceive him.

The two papers, therefore, should be read as if the company had agreed that at the expiration of twenty years the distributive share of surplus to which the policy would be entitled would be $996.08. This was the construction of the contract by Forman at the time it was made; this was the construction that the company intended should be placed on it by him and this is the construction that we put on it.

When an insurance company puts out papers like this "illustration" and makes them a part of its policy contract, as it did in this case, it should be required to perform the stipulations of the contract, including those contained in the papers that are made a part of it according to their reasonable interpretation and according to the interpretation the company intended the insured should place on them and that he did place on them. Insurance companies, dealing as they do with all classes of people, should not be allowed to purposely mislead or deceive their patrons by preparing for their information and guidance statements, and after securing contracts on the faith of these statements, repudiate them, and escape liability on the pretense that the papers or statements were merely allowable advertising schemes or expressions of an opinion as to what the company hoped it might be able to do. This should be so because the great majority of persons who take out life insurance have no acquaintance with the business of insurance or the manner in which it is conducted, and hence are obliged to depend for information on the assurances and representations made by the company as to what it will do.

We may pass with short comment the argument that the company could not know what the amount of surplus to which the policy would be entitled at the end of twenty years would be, and, therefore, it could not reasonably have specified the sum of $996.08. This was a matter for the company to determine for itself, and as it voluntarily elected to set down the precise sum

that its surplus would amount to, it must stand by its act.

To sum up our conclusions, we think: (1) that when an authorized agent of an insurance company attaches to the policy, or, without physical annexation, by his representations or assurances makes a paper, by whatever name called, a part of the policy contract, and on the faith of the statements in this paper the insured is induced to accept the contract, the paper becomes a part of the contract and the company is bound by its stipulations.

(2) That if there is reasonable doubt as to the meaning of the contract, that construction should be adopted that will carry out the understanding of the insured as to the meaning of the contract at the time he accepted it, if it is fairly made to appear that his understanding of its meaning was produced by and based on representations and assurances in writing made to him by the company before or at the time the contract was executed, and these representations and assurances were of such a nature as to reasonably induce the insured to believe that his understanding and construction of the contract would be carried out.

Wherefore, the appeal prayed for is granted and the judgment reversed, with directions to enter a judgment for Forman in conformity with the prayer of his petition.