## GILLESPIE v. SECURITY MUTUAL LIFE INSURANCE COMPANY.

*Insurance—Liability on life policy—Unsigned, attached illustration not part of contract—Construction against discrimination among policyholders—Section 9403, General Code.*

1. An illustration of the possibilities of a life insurance policy, although attached to the policy under such circumstances as to estop the insurer from denying it a place in the contract, will not of itself enlarge the liability of the insurer where the policy, including the illustration, fairly shows a fixed limited liability.

2. A policy of insurance will not be so construed as to make it violative of Section 9403, General Code, prohibiting discriminations between policy holders of the same class, if such construction can be fairly avoided by all the terms of the policy.

(Decided February 15, 1924.)

ERROR: Court of Appeals for Athens county.

*Messrs. Woolley & Rowland,* for plaintiff in error.

*Messrs. Jones & Jones,* for defendant in error.

MAUCK, J. Gillespie brought his action in the Common Pleas upon a matured endowment life insurance policy issued to him by the defendant in 1902. The policy was for $1,000. The plaintiff claimed that he was entitled to the face of the policy, plus $523 surplus, subject to a loan previously made him of $925.53, and that the net amount owing him at the maturity of the policy was $597.47. The defendant at the conclusion of plaintiff's testimony tendered judgment for $161.06, on the theory that the plaintiff was entitled to a surplus above the face of the policy of $86.58, instead of the $523 claimed by plaintiff. After the case had been finally submitted to the jury the trial court sustained a motion of the defendant and directed a verdict for the plaintiff for the amount conceded by the defendant, and to the judgment that followed error is now prosecuted by the plaintiff.

The undisputed evidence is that the amount of surplus actually apportioned to the policy sued upon was $86.58. The question at issue, therefore, is whether the plaintiff was entitled to the surplus so apportioned or was entitled to the surplus of $523 claimed by him.

Among the provisions of the policy was one covering the question at issue in the following language:

"Third. That at the end of the endowment period, provided this policy is in full force, the company will declare a dividend to the insured

or assigns of the share of the surplus then found by its actuary to be apportionable to this policy, which dividend may be drawn in cash, together with the endowment; or total cash value may be converted into a paid up policy (subject to medical examination and the company's approval for any excess in paid up insurance over the amount of the original policy).''

Preceding the provision quoted was a table of loan values, surrender values and paid up continuing insurance values.

If the foregoing were all the pertinent provisions of the contract between the parties there could be no question that the position of the company was sound, and that the plaintiff was entitled only to the increase of $86.58 actually apportioned by the actuary, unless such apportionment was impeached as unfair, and no such impeachment was attempted. The plaintiff, however, relies upon an additional paper, entitled ''Illustration for Endowment Policy,'' pinned to the policy at the time it was delivered to the plaintiff by the agent who solicited him. This paper recites the same loan values, surrender values, etc., that appear in the body of the policy heretofore mentioned. At the bottom of the ''illustration,'' and following the tables, appears this language not found in the policy proper.

''If the insured be living and the policy is in force at the end of *twenty* years, the insured or assigns will be credited with an equitable share of the surplus then found by the Actuary of the Company to be apportionable to the policy. Assumed surplus *$523* which will be paid in cash together with the endowment of *$1,000;* Total *$1,523,*

or total cash value may be used as a single premium in purchase of paid up insurance *$3,244;* (subject to medical examination and the Company's approval for any excess in paid up insurance over the amount of the original policy). The endowment policy herein illustrated contains the largest guarantees, grants freedom of residence, occupation and travel from its date, is incontestable for any cause after one year, non-forfeitable after three years, and payable immediately on receipt of proper proofs of claim. The company is purely mutual, and the expenses of management limited and inflexible. All profits belonging to and will be paid to persistent policy holders.''

The italicized word and figures are made by pen, the remainder is printed matter.

It is clear from the record that the company never authorized the soliciting agent to attach this illustration to the policy and make it a part of the contract. It is equally clear that such solicitor did attach it to the policy and that the policy as delivered had the illustration attached by a pin thereto.

The claim of the plaintiff is that the action of the agent in making the illustration a part of the contract is binding upon the company within the doctrine laid down in *Foster* v. *Scottish Union & Natl. Ins. Co.*, 101 Ohio St., 180. That was a case of fire insurance where the policy provided against liability if the building covered was situated on property not owned by the insured in fee simple. The building was in fact situated on a leasehold. The agent of the company knew that it was a leasehold before the policy was issued and the premium paid. The insured, however, did not

know that the policy contained such a provision as that relied upon by the insurer, as he never saw the policy until it came into his possession after the fire. Upon this state of facts the court held in the *Foster case* that the knowledge of the agent as to the title was the knowledge of the company. This opinion is not helpful in the pending litigation. The question here is not what the company knew, but what it promised to do. The *Foster case* did not hold that the agent had power to add anything to the company's promise to pay. If the agent, by virtue of his agency, has the power, by attaching a rider, to enlarge the company's liability to pay dividends, no reason is apparent why he could not in the same way increase the face of the policy or shorten the period of its maturity.

If the plaintiff is entitled to the construction claimed by him it must be on some other grounds. It is claimed that such other grounds are present because on several occasions the insured returned the policy in question to the home office of the company, where the officers could have, and in the course of business would have, observed that the illustration was pinned to the policy. The company's officers answer that on the occasions when the policy was returned to the home office none of them saw or had occasion to see the attached illustration and that they were ignorant of its existence until after the policy had matured. Whether the company did or did not know of the existence of the illustration was a question of fact, and as the trial judge in directing a verdict was bound to give the evidence that interpretation most favorable to the plaintiff it must now be assumed that

the executive officers of the company had knowledge during the life of the policy that the illustration was pinned thereto. This state of facts approaches that found in *Forman* v. *Mutual Life Ins. Co.*, 173 Ky., 547, 191 S. W., 279, L. R. A., 1918F, 330, where it was held that an illustration somewhat like the one in the case at bar became a part of the contract of insurance. As will be observed by the opinion in that case, the note thereto in L. R. A., 1918F, at page 343, and *Maddox* v. *Mutual Life Insurance Co.*, 193 Ky., 38, 234 S. W., 949, 22 A. L. R., 1276, annotated in the latter volume at page 1284, the weight of authority is that illustrations of the kind in question are mere expressions of opinions as to future earnings and not parts of the policies or guarantees that the expectations will be realized, although a number of the cases cited support the other view.

It is undisputed that under the policy sued on Gillespie was to pay $49.07 premium per year. Of this, $8.26 went to the General Fund, where it was available for expenses and any purpose for which the company needed it. The balance, $40.81, went to the reserve fund. This reserve fund so built up by this and other policy holders, with the earnings thereof, constitutes a sort of trust fund, under the supervision of the state, and is to be used in paying death claims as they arise and endowments when due. If the insurer preserves its solvency it must have placed in the reserve an amount which, with the earnings thereof, will be sufficient to meet the claims when they become payable by death or otherwise. The experience of mankind has taught that men of insurable condition can reasonably be expected to live a certain

number of years. War and epidemics accelerate the death rate, however; while modern science, through improved sanitation, surgery, and otherwise, is constantly extending the length of the average life. These factors of uncertainty make it prudent for an insuring company to charge a premium a little higher than it is thought will be absolutely necessary to meet the demands of the policy holders as they mature. This prudent overcharge results in accumulating a surplus, which may be large if the policy holders have lived longer than expected and accumulations from interest have been larger than anticipated. If the policy holders have died sooner than has been counted on, if losses in investment have occurred, or if interest accumulations have been diminished, the surplus will be decreased, or possibly exhausted. If the surplus be thus destroyed and the reserve fund itself seriously impaired the capital stock of the company would afford some slight additional protection, if the insurer were a stock company, but where it is a mutual company, as it is in this case, the reliance of the policy holders is solely on the integrity of the reserve fund. These elementary principles are here recited because it is with a knowledge of them, actual or constructive, that the insurance is made.

While we adhere to the view expressed by the majority of the authorities that the unsigned illustration attached to the policy with the company's knowledge does not become a part of the contract, and can not alter the liability fixed by the policy proper, we will assume for the purpose of the instant case that the company is estopped from denying the illustration a place

in the contract. What then are the rights of the parties when the contract is construed as a whole? In the third provision of the policy heretofore quoted the company agrees at the end of the endowment period to declare a dividend to the insured "of the share of the surplus then found by its actuary to be apportionable to this policy." That is to say, that it will return to the policy holder out of the surplus such an amount as it has collected from the policy holder in excess of what was actually required to safely carry the risk. This provision recognizes what both parties were bound to know, that is, that as no one could know the condition of the reserve fund and the surplus thereof, if any, until after the policy had matured, so no definite agreement could earlier be made as to what the policy holder's share of that surplus would be, for a dividend means only a fair share of the surplus. With this positive provision of the policy we come to consider the illustration. It is conspicuously headed "Illustration for Endowment Policy." It does not, therefore, by its title import to be a policy or a part of one, but an illustration of one. Illustration means exemplification. Its office is to render the obscure clear and obvious. The fact is that this particular illustration did not do this, and is so vicious in form as to excite indignation, nevertheless it did not assert itself to be more than an illustration. Nor does the body of it make a positive engagement out of harmony with the third provision in the policy proper. It first stipulates that if the insured be living at the maturity of the policy he will be credited with his equitable share

of the surplus to be determined by the company's actuary. There then follows this sentence:

"Assumed surplus $523 which will be paid in cash together with the endowment of $1,000; Total $1,523 or, total cash value may be used as a single premium in purchase of paid up insurance $3,244."

This language is unfortunate. It is indeed much worse and approaches dishonesty, for it allows a casual reader to emphasize the figures and words "$523, which will be paid in cash," and may lead him to overlook the fact that the surplus which forms the only fund out of which it can be paid is "assumed" and cannot be determined until the twenty-year term of the policy has run. The illustration concludes:

"The company is purely mutual and the expenses of management limited and inflexible. All profits belonging to and will be paid to persistent policy holders."

This was a statement of fact and law that did not affect the relations of the parties one way or another. The company was mutual and its expenses limited to the amount fixed in the policy as apportioned to the general fund.

While one sentence of the illustration is misleading, and so drawn as to enable a prospective policy holder to be deceived, and while it is likely that Gillespie was deceived in this transaction, nevertheless the conclusion is reached that he ought to have realized that the terms of the contract are to be determined not by what an agent says, or does, and not by what a part of a sentence may recite, but by the policy as a whole.

The principle that where a policy of insurance

is capable of two constructions it shall be given that interpretation most favorable to the insured is a familiar and wholesome one, but has no application here. The rights of the parties as fixed by the contract as a whole are not ambiguous. To permit a recovery under the facts in this case would be a violation of the rights of all of the plaintiff's fellow members. Whatever one policy holder takes from the reserve fund of the company in excess of his equitable share thereof as determined by the company's actuary is a loss that falls on his innocent fellows and not on the agent or officer who might have been responsible for his delusion. Such recovery would transgress the letter and spirit of the statutes. Section 9403, General Code, prohibits a life insurance company from making any discrimination between policy holders of the same class in the distribution of dividends, or otherwise, and limits the liabilities it can create to such as are plainly expressed in the policy. The succeeding section imposes a penalty upon any company or agent who allows, directly or indirectly, any person any special advantages in dividends or otherwise. It would accordingly be against the policy of the law to give the illustration the strained construction claimed for it by the plaintiff. It would be tantamount to conferring a special privilege on the plaintiff at the expense of other members and would clearly violate unequivocal provisions of the policy.

*Judgment affirmed.*

MIDDLETON, P. J., and SAYRE, J., concur.