[Civ. No. 7928. First Appellate District, Division One.—November 28, 1931.]

BALIE PEYTON LEGARE, Respondent, v. WEST COAST LIFE INSURANCE COMPANY (a Corporation), Appellant.

Francis V. Keesling, C. A. S. Frost and Garton D. Keyston for Appellant.

William M. Abbott, K. W. Cannon, Cyril Appel and Ivores R. Dains for Respondent.

GOODELL, J., *pro tem.*—This appeal is from a judgment on a verdict for $2,826.85. The action was brought by the respondent, a policy-holder, to recover from the appellant, an insurance company, the share of the surplus earnings, apportioned at the end of the twenty-year period, to which the respondent claims his policy is entitled. The appellant claims that such share is $1,025.87 and no more, which amount it always has stood ready to pay. The position of the respondent is that the policy contains an outright promise to pay a stated figure as the policy's share of the surplus earnings, which view was taken by the jury. The question presented is whether a so-called illustration sheet attached to a policy of life insurance is a part of the contract and, if so, whether the legal effect of an "option" therein is a promise to pay the insured (at his election) the amount therein shown, or merely an estimate and a prediction that such amount ought to be coming to him at the end of twenty years.

In 1909 the appellant issued to the respondent a $5,000 endowment policy, on the first page of which is found, among other promises, the following: "Twenty years from

the date hereof, which is the end of the dividend period, the Company guarantees that the Cash Value of this Policy . . . shall be $3440 . . . and in addition thereto the Policy's share of the Surplus Earnings then apportioned by the Company.'' The signatures of the officers appear upon the first page only, and just above them is the provision that ''the Benefits, Statements and Values on the succeeding pages of this Policy are made a part hereof''. On the question whether the illustration sheet was attached to the policy when issued, the respondent testified without contradiction that when the policy was delivered to him the sheet was pasted to its third page; further, that the figures on the sheet were substantially those given him by the agent during negotiations; that in 1929 when he last saw the policy the sheet was attached as at first; and he introduced in evidence a photostatic copy of the ''policy'' sent him by the appellant in 1920, which included the ''illustration''. The sheet, detached from the policy,—but with its missing upper left-hand corner still stuck to the third page,—was introduced in evidence without any testimony, however, as to when or how it had become detached. All these facts were, of course, before the jury, whose verdict for the respondent impliedly found as a fact that the sheet was physically attached to the policy when delivered, and we are satisfied that the evidence on that score is more than sufficient to support the verdict.

In addition to the question thus presented to the jury, we are satisfied that the sheet was, as a matter of law, part of the policy and so intended to be by the company. The appellant points out that the policy contains no stipulation expressly making the illustration part of it, but meaning and effect, must, of course, be given to the provision on the first page of the policy that ''the Benefits, Statements and Values on the succeeding pages of this Policy are made a part hereof''. The company doubtless recognized that the form in general use would not be adequate to cover all possible risks, and that peculiar and special cases were bound to arise and would have to be added. This very case presents an example of that, for the uncontradicted evidence shows that this was to be a ''special policy issued to only a very few professional men'', and further, that the figures in the illustration were made up by the company's actuary

at the time, for this policy. The illustration sheet contains "benefits" and "values"; it certainly is a "statement", and it was pasted to one of the "succeeding pages". We are satisfied that the jury could have reached no other conclusion on the facts, but we are satisfied also, that the language of the policy itself was designed to, and did, incorporate the illustration sheet into it.

Attention is drawn by the appellant to the fact that the "illustration" is not signed, and section 416 of the Civil Code requiring all policies to be subscribed by the president or vice-president and countersigned by the secretary is invoked, as well as a provision of the policy itself so requiring. The policy proper is of course signed. That is all that the law requires. No requirement has been called to our attention that every rider attached to a policy must, likewise, be signed. It is not a question of a modification of the policy after its issuance. This sheet, as we have seen, was part and parcel of the policy when it was issued.

The principal inquiry is as to the legal meaning of this illustration sheet. Is it, in law, a definite and specific amplification of a broader and more general promise, or is it mere "sales talk" designed to entice a prospective insured? This inquiry calls for a somewhat detailed examination of the paper.

The sheet is much like an ordinary business letter-head in size and appearance, with the company's name printed, and its home office building pictured, at the top. Its design, printing and ruling show that it was specially prepared. It is printed in red and black ink and ruled horizontally and in vertical columns with spaces left for the filling in of figures. In what follows, italics will be used to indicate what is written in, all else being printed in tpye of varying sizes and styles. Under the company's name is printed "Office Clinton J. Hutchins General Agent California" and his address. Then follows the heading "Illustration" in large type, and under it the following:

"Limited Premium Policies *Deposit $394.00 1st 10 yrs.* Age *45* Amount *$5,000—* Deposit *$151.50 2nd 10 yrs.* Options or Settlements at the Selection of the insured at the end of the Deferred Dividend Period (*20* years)

(In red ink): The only figures authorized by the

Company to be inserted in this blank are those printed in its rate book.

Options.  1st.  Receive a Fully Paid-up Participating Policy for *$5000.00* and the surplus *$2881.48*

Earnings then apportioned  In Cash, or

2nd.  In Equivalent Paid-up Participating Insurance, or *$8914.00*

3rd.  In Equivalent Annual Income for life, or *$735.00*

4th.  Withdraw the Guaranteed Cash Value of *$3440.00* and in addition the Surplus Earnings then apportioned In Cash *2,881.48* Total *$6,321.48*''

(The figures $2881.48, both times they appear, are written in red ink; all other figures are written in black ink.)  Then follow six columns (not particularly material here) under the heading "Guaranteed Values  These values are in the policy", such columns being entirely filled in by handwritten figures and showing, respectively, the amount payable in event of death, cash or loan value, automatic paid up life insurance and extended insurance at each of the twenty years, the tables being filled out, obviously, to fit this particular case.  The whole table we have described fills the entire sheet.

Clinton J. Hutchins testified that the company furnished the illustration blanks and that the figures on this one were written by Eugene D. Eaton, one of the agents through whom this policy was written.  E. L. King, Easton's fellow-agent in writing this policy, testified, on behalf of the appellant, that the figures he had written in "had to come from the home office" and, further, that "Mr. Eaton got those figures from Mr. Beaudry; . . . He was the actuary of the company . . . the actuary's duties in a life insurance company are to figure out any kind of a contract.  I have had other contracts figured out by him that were not in the rate book, and Mr. Beaudry would figure them out for you. He was employed by the company for that purpose; he was one of the officers of the company."

We are satisfied that the illustration is an amplification and extension of the "guarantee" already quoted and that it should be read as part of it.  In the "guarantee" on the

first page, the company fixed $3,440 as the cash value of the policy at the end of twenty years, but at that point it descends into no detail with respect to the additional "Surplus Earnings then apportioned by the Company", or as to how they shall be arrived at, or what they amount to. The illustration sheet seems to be an appropriate way to accomplish this; its contents are in no way inconsistent with the general guarantee, but, on the other hand, dovetail with it. It is a settled principle that what is written controls what is printed in a contract. (Civ. Code, sec. 1651.) The general guarantee (except the figure $3,440.00 which was written in) is printed, and presumably is to be found in every policy of this type; the illustration on the other hand is almost entirely handwritten. There is nothing on the face of the illustration sheet to indicate that it was mere "sales talk" or simply a prophesy or estimate. On the contrary, everything about it is consistent with the idea that it is an amplification of the general language of the guarantee provision found on the first page, for it makes clear, definite and specific what has been only general. Further, if the illustration were not intended to mean what it says, why attach it to an already formidable document? Take, for instance, the heading "Options or Settlements at the Selection of the insured at the end of the Deferred Dividend Period (20 years)". Certainly this is tantamount to a promise that at the end of twenty years the company will pay the amount therein shown according to the option which the insured elects to exercise. Then follows a somewhat guarded statement printed in red ink: "The only figures authorized by the Company to be inserted in this blank are those printed in its rate book." But an insured is not supposed to know what figures are, or are not, printed in the rate book, and there is nothing in the record to show that the respondent knew anything about them. Moreover, the figures were supplied and written in by the company's people, and the sheet, by being pasted to it, was made a part of the policy, as has been noted. Then follow the "Options". The fourth is the one in question, namely: "Withdraw the Guaranteed Cash Value of *$3440.00* and in addition the Surplus Earnings then apportioned In Cash. *2881.48 Total $6,321.48*". If, as contended by the appellant, the illustration is not to be read as part of the policy,

although physically attached to it, and if its language is not contractual language, what possible purpose is it supposed to serve? (Civ. Code, sec. 1641.) If it had served its purpose in enticing the respondent to become an insured, it is difficult to understand why it was left attached to the policy when it was delivered. The respondent relies chiefly upon the case of *Forman* v. *Mutual Life Ins. Co.*, 173 Ky. 547 [Ann. Cas. 1918E, 880, L. R. A. 1918F, 330, 191 S. W. 279, 285]. What is said therein aptly applies to this inquiry and may well be adopted: "But if the company did not intend to practice a fraud on Forman or to deceive him . . . what was the purpose in making a part of the contract this 'illustration' and specifying in it that he should have the option at the end of twenty years 'to draw accumulated surplus in cash, . . . $996.08'?"

We are satisfied with the reasoning of the Forman case, and we can find no substantial distinction between that case and this. An earlier Kentucky case upon which the respondent relies—and we think with justification—is *Equitable Life Assur. Soc.* v. *Meuth,* 145 Ky. 160 [Ann. Cas. 1913B, 661, 140 S. W. 157, 158]. A reference to the report of that case will show the facts to be substantially the same as those in the instant case. In analyzing the language "together with the surplus then apportioned by the Society", the court says: "When we come to construe the contract the only purpose of the writer in setting down the figures '544' after the words 'together with the surplus then apportioned by the Society' could have been to indicate that the surplus thus apportioned by the Society should be $544. This is not only the natural meaning of the words but we do not see how any other meaning can be given to them. In like manner the figures '544' after the word 'cash' must mean $544 in cash. The grammatical construction of the words is that in the second contingency the policy holder may continue his policy and withdraw the accumulated surplus either in cash, $544, or have paid up insurance $1,000 or an annuity."

In all the cases relied upon by the appellant, distinctions are to be found either in the language used in the illustration or in the way it is related to the policy proper. *Maddox* v. *Mutual Life Ins. Co.*, 193 Ky. 38 [22 A. L. R. 1276, 234 S. W. 949, 950], is cited from the same jurisdiction as the Forman and Meuth cases. It holds the language to be non-

promissory, but it in no way questions the authority of the Forman case. A brief quotation of the language found in the "Adapted Illustration" in Maddox's policy, will show at a glance that the case is not similar to either the Forman case, the Meuth case, or the case at bar. It read: "The accompanying figures are correct as an illustration adopted from the past experience of the company'. . . . The surplus portion, i. e., former results ($10,247), added to the reserve value or incorporated with the equivalent options in this example is to be understood as a sum adapted for purposes of general illustration only, and to be based on actual experience in policy results of the past, and not as pledged hereby in future settlements." The court itself distinguishes the two as follows: "It will thus appear that the deceptive language found in the Forman Illustration is wanting in the Maddox Illustration, since in the latter attention is sharply drawn to the reserve which is 'guaranteed', and to the item of surplus immediately thereunder, which purports, to be only 'former policy results'." In *Mutual Life Ins. Co.* v. *Brock*, 203 Ky. 229 [262 S. W. 4], also relied upon by appellant, the "Adapted Illustration" was hedged in with the same language found in the Maddox policy and just quoted. The Kentucky Court of Appeals simply followed the Maddox case, pointing out its distinction from the earlier Forman decision. *Tourtellotte* v. *New York Life Ins. Co.*, 155 Wis. 455 [144 N. W. 1117], *Untermyer* v. *Mutual Life Ins. Co.*, 128 App. Div. 615 [113 N. Y. Supp. 221], and *Williams* v. *New York Life Ins. Co.*, 122 Md. 141 [89 Atl. 97], are likewise relied upon by the appellant. All are distinguishable from the case at bar and the distinctions pointed out in the Forman case.

The appellant argues that the respondent, an intelligent professional man, could not possibly have been misled into believing that the surplus earnings apportionable to a particular policy twenty years thereafter could be forecast or predicted when the policy was written. The testimony is interesting in this regard, for it shows that the respondent questioned this very point at the time. "Q. What did you say? A. I asked why they could come to the definite figure, and they said they knew how to do it. Q. But that didn't fool you, did it? A. I am not a life insurance man, and I

did not know anything about how they did their business. Q. You did not really believe that when they first told you that? A. I absolutely did. If I did not I would not have taken the policy. . . . I did not take the agent's word. I took the policy itself which came from the company, I assumed they knew their business." It must also be borne in mind in this same connection, that the policy was permitted to lapse and that the company's renewal superintendent successfully solicited the respondent to have it re-instated. This was done. The same policy, with the same illustration sheet attached, was reinstated and, as has been said, when a photostatic copy was sent the respondent such copy included the illustration sheet. Twice, then, the respondent acted upon the figures in the illustration sheet, and the second time, if not the first, he changed his position and reobligated himself after he had once permitted the policy to lapse.

Under the heading "Statement" on page 2 of the policy are found certain provisions in fine print, among which is the following: "In any apportionment or distribution of surplus earnings, the principles and methods which may be adopted by the Company for such apportionment or distribution, and its determination of the amount belonging to this Policy, shall be conclusive upon the Insured. . . . " It is urged that this provision binds the respondent to accept the $1,080.50 without question. A card was introduced in evidence showing $1,080.50 to be the amount apportionable at the end of the twentieth year, and there was testimony that that figure was arrived at according to a principle and following a method. There was nothing to show, however, what the principle was or what method was followed. But be that as it may, from the view we take of the case we are satisfied that the respondent was not subject to this stipulation in the policy. The fourth option, which he exercised, called for the payment of a stated, definite figure, and any computation less than that—however arrived at— would not alter the appellant's obligation.

We find no error in the record and for the reasons herein given are satisfied that the judgment should be affirmed. It is so ordered.

Tyler, P. J., and Knight, J., concurred.

A petition for a rehearing of this cause was denied by the District Court of Appeal on December 28, 1931, and an application by appellant to have the cause heard in the Supreme Court, after judgment in the District Court of Appeal, was denied by the Supreme Court on January 25, 1932.