PATTERSON and others, Respondents, vs. THE NATURAL PREMIUM MUTUAL LIFE INSURANCE COMPANY OF MADISON, WISCONSIN, Appellant.

*May 3 — June 23, 1898.*

*Life insurance: Construction of policy: Interest of beneficiary: Suicide, when a defense: " Violation of law: " False statements as to health: Incontestable clause.*

1. In case of doubt or ambiguity the language of an insurance policy should be construed most strongly against the insurer.
2. One to whom, as beneficiary, a policy of life insurance is payable or has been assigned has, until the insured makes a change of beneficiary, such a vested, subsisting interest in the policy as would pass to his personal representatives in case of death.
3. Where third persons are beneficiaries, intentional suicide of the insured while sane does not avoid a policy of life insurance, in the absence of any provision in the policy to that effect. [What would be the rule in an action by personal representatives of the insured for the benefit of his estate, not determined.]
4. Although suicide is technically a crime, it is not within the meaning of a clause in an insurance policy providing that death in consequence of, or in, violation of law is not covered by the policy, where the usual suicide clause is omitted and the policy provides that it shall be absolutely incontestable except for nonpayment of premiums or misstatement of age.
5. False statements or concealment of the insured in respect to his health are covered by an incontestable clause in the policy.

APPEAL from a judgment of the circuit court for Dane county: R. G. SIEBECKER, Circuit Judge. *Affirmed.*

This is an action to recover upon an insurance policy issued by the appellant July 20, 1895, upon the life of Alexander W. Patterson, and originally payable to the administrators, executors, or assigns of the insured. On the 4th of October, 1895, the policy was assigned, with the consent of the company, to the plaintiffs, who are the children of the insured.

Alexander W. Patterson was forty-nine years of age at the time of the issuance of the policy, and was then married to his second wife, by whom he had no children; the plaintiffs being his children by a previous marriage. The first year's premium upon the policy was paid, and the insured died by his own hand February 25, 1896. Proofs of the death were duly made.

There was a written application, on which the policy was issued, which contained the following warranty: "I hereby certify that I have read all the statements and answers in this application, and warrant and agree that no circumstance or information has been withheld or omitted touching my past and present state of health and habits of life, and that said statements and answers, together with this declaration, as well as those made or to be made to the company's medical examiner, are true, and shall be the basis of the contract applied for." The policy itself contained the following provisions, among others: "This policy is absolutely incontestable from the date of its delivery and acceptance, except for nonpayment of premiums or misstatement of age; and the latter may be corrected or adjusted if the age of entry was within the limit of ages insured by this company. . . . Engaging in military or naval service in time of war or insurrection, without the written permission of the company, or death in consequence of, or in, violation of law by said insured, are risks not assumed by this company." There was no special provision as to death by suicide.

The defense was that Patterson intentionally suppressed facts, and made deliberate false statements of other facts, as to his health, in the written application, and also that he fraudulently procured the issuance of the policy, with intent to commit suicide, as a part of a scheme to defraud the defendant out of the sum of $3,000 for the benefit of his children, and that in furtherance of said scheme he deliberately shot and killed his wife, and then immediately afterwards shot and killed himself, and that his death was in consequence of, or in, violation of law.

The evidence showed that the deceased, in his application, represented his health as fair, but that he had some palpitation of the heart, dyspepsia, and malaria, and that he had applied for a pension on the ground of indigestion caused by exposure in the army. Upon this application the medical examiner of the company reported the health of the insured as fairly good, but that he had dyspepsia and was a second-class risk. It appeared further that in 1890 the insured had made application for a pension on account of disability resulting from rheumatism, severe stomach and heart trouble, and throat trouble, with general debility and prostration. There was also some testimony tending to show that the deceased was in better physical condition at the time of the issuance of the policy than he was when he made application for the pension. The policy was actually written July 20, 1895; but the premium was not paid, nor the policy taken from the office by the insured, until October 1, 1895. On the 4th of October, 1895, he assigned the policy to his children, at the company's office, and then inquired as to his wife's legal rights in his property in case she survived him. The insured had no active employment, and was in financial difficulties, and shortly prior to his suicide talked with his children considerably about his business affairs, but showed no evidence of insanity. On the night of February 25, 1896, he deliberately shot and killed his wife at his home, and

then called his daughter to the room, to see that she was in fact dead, after which he shot and killed himself. The expert evidence given on the trial tended strongly to show that the insured was sane when he killed himself.

A verdict for the plaintiffs was directed for the face of the policy, and from judgment thereon the defendant appeals.

For the appellant there were briefs by *A. R. Bushnell* and *R. M. La Follette*, and oral argument by *Mr. Bushnell*.

For the respondents there was a brief by *Jones & Stevens*, and oral argument by *Burr W. Jones* and *E. R. Stevens*.

WINSLOW, J. There was evidence tending to show that the deceased was sane when he shot himself; hence, the verdict having been directed, it must be assumed upon this appeal that such was the fact. Starting from this basis, the argument of the defendant is, in substance: (1) That intentional self-destruction while sane is not a risk covered by a policy of life insurance, even when there is no clause in the policy specifically exempting the company from liability for such death; (2) the incontestable clause does not cover such a death, and, even if it be held to do so by its terms, such a stipulation would be void, as against public policy; (3) intentional self-destruction while sane is a crime, and hence the stipulation providing that death in violation of law is not a risk assumed by the company defeats a recovery.

Upon the first proposition, reliance is placed upon the recent decision of the supreme court of the United States in the case of *Ritter v. Mut. L. Ins. Co.* 169 U. S. 139. In this case it was distinctly held that intentional self-destruction by the assured while sane is not a risk covered by a life insurance policy, even when the policy contains no exception as to such a death; and it was further said that such a risk could not be legally covered by a policy, because it would be against public policy to make such a contract. This was

an action by the executors of the estate of the assured upon a policy payable directly to his executors, administrators, and assigns; and there was much evidence tending to show that the assured deliberately effected this, and a large amount of other life insurance, with the intention of committing suicide, and thus enriching his estate and paying his debts. Another and perhaps the only other direct adjudication to the same effect is the decision in the case of *Supreme Commandery K. G. R. v. Ainsworth*, 71 Ala. 436. The principle upon which these decisions rest is thus well stated in the last-named case: " Death, the risk of life insurance, the event upon which the insurance money is payable, is certain of occurrence. The uncertainty of the time of its occurrence is the material element and consideration of the contract. It cannot be in the contemplation of the parties that the assured by his own criminal act shall deprive the contract of its material element,— shall vary and enlarge the risk and hasten the day of payment."

The authorities upon which these decisions are principally based consist of certain expressions of opinion contained in *Hartman v. Keystone Ins. Co.* 21 Pa. St. 466; *Moore v. Woolsey*, 4 El. & Bl. 243; and *Amicable Soc. v. Bolland*, 4 Bligh (N. S.), 194, in none of which cases, however, was the question directly in issue. Support for the proposition is also drawn from the well-established principle of the law of fire insurance, that, if the insured intentionally set fire to the property insured and destroy it, he cannot recover for the loss. It is certainly not to be denied that the reasoning in favor of the proposition is cogent, and, were the question a new one in the law, the argument would be well nigh irresistible, especially where, as in the *Ritter Case*, the policy runs in favor of the estate of the insured, and the proceeds will go to the enrichment of such estate, instead of to other beneficiaries. But it is by no means a new question, and there are numerous authorities which directly hold that,

where life insurance is effected for the benefit of wife or children, suicide while sane is not a defense, in the absence of a condition or exception to that effect in the policy. *Fitch v. Am. P. L. Ins. Co.* 59 N. Y. 557; *Darrow v. Family F. Soc.* 116 N. Y. 537; *Patrick v. Excelsior L. Ins. Co.* 67 Barb. 202; *Mills v. Rebstock,* 29 Minn. 380; *Kerr v. Minn. M. B. Asso.* 39 Minn. 174; *N. W. B. & M. A. Asso. v. Wanner,* 24 Ill. App. 357. This principle was stated as the law in *McCoy v. N. W. Mut. R. Asso.* 92 Wis. 577, although it probably was not directly involved in that case. The American text-books which treat of the subject very generally state this to be the law. 1 May, Ins. § 324; Niblack, Ben. Soc. & Acc. Ins. § 156; 3 Joyce, Ins. § 2653; 3 Am. & Eng. Ency. of Law (2d ed.), 1016. While these text-book citations may not be considered as very convincing, they certainly tend to show the general impression prevailing among the legal profession upon the subject, and that impression certainly prevailed in the supreme court of the United States when the case of *Life Ins. Co. v. Terry,* 15 Wall. 580, was decided; for in that case Mr. Justice HUNT refers to the contrary *dictum* in *Hartman v. Keystone Ins. Co.* 21 Pa. St. 466, as *confessedly unsound.* The fact that insurance companies have almost universally deemed it necessary to insert in their policies provisions exempting them from liability in case of suicide, "sane or insane," may perhaps also be considered as showing the general trend of opinion upon the subject in insurance circles; but, whether this deduction is to be properly drawn or not, we think it certain that the fact that life insurance policies universally contain this provision is of weight in determining the construction now to be placed upon a policy which omits all specific reference to suicide, and also ostentatiously contains a clause providing that it shall be absolutely incontestable for any cause save for nonpayment of premiums or misstatement of age. What would an applicant for insurance be entitled to think was the meaning of

such a policy, when presented to him, garnished with the usual and customary commendations of the average solicitor of insurance? Certainly he would not think that its legal effect was the same as that of a policy containing the usual provisions against suicide, sane or insane.

The policy before us was originally payable to the administrators, executors, or assigns of Patterson; but within a few days it was assigned, with the consent of the company, to the plaintiffs, his children, and so remained. After this assignment it was no longer a policy in favor of Patterson's estate, but in favor of his children, as beneficiaries, as much as though originally made payable to them. Under the decision of this court in *Foster v. Gile*, 50 Wis. 603, such a beneficiary has an actual, subsisting interest in the policy, subject to the right of the insured, who has paid the premiums, to vest it elsewhere; but, until such action by the assured, the interest of the beneficiary is such a vested, subsisting interest as would pass to the administrator of the beneficiary in case of his death. Such being the case, it falls directly within the principle of the New York and Minnesota cases before referred to, which hold that, as against such a beneficiary, suicide of the insured while sane is not a defense, in the absence of a provision in the policy. Nor would the application of that principle to this case necessarily conflict with the *Ritter Case*, where the policy was in favor of the estate of the insured. It may well be in such a case that the intentional suicide of the insured while sane would prevent a recovery by his personal representatives, and yet not prevent a recovery in case of a policy in favor of beneficiaries who had a subsisting, vested interest in the policy at the time of the suicide, and who could not, if they would, prevent the act of the insured.

In determining what rule should be adopted by this court in the present case, there are numerous considerations which deserve attention. It must be borne in mind that the sui-

cide clause has become so universal in policies that its absence at once attracts attention. It can hardly be otherwise than that the agent soliciting insurance under such a policy as this would at once call attention to its apparent liberality, in that there was no suicide clause, and, further, that there was in addition an "absolutely incontestable" clause; and the average layman (not to say lawyer), in looking it over, would conclude that it was in fact a very favorable policy to the insured. These provisions are all carefully framed by the insurance company, and expressly framed to induce people to insure; and the principle is familiar and just that, when the policy is capable of two meanings, that which is most favorable to the insured is always to be adopted. *Utter v. Travelers' Ins. Co.* 65 Mich. 545. In at least one state (Missouri) there exists a statute which prohibits the defense of suicide, except when it was contemplated at the time of effecting the insurance, and makes void any contrary stipulation in the policy. R. S. of Mo. 1889, § 5855. This statute has been enforced by the courts of Missouri, and by the circuit court of appeals of the United States, without apparent question as to its validity on the ground of public policy. *Keller v. Travelers' Ins. Co.* 58 Mo. App. 557; *Knights' Templar & M. L. I. Co. v. Berry,* 4 U. S. App. 353, 50 Fed. Rep. 511. Bearing these things in mind, and while conceding the strength of the arguments upon public policy on which the *Ritter Case* is based, we still think, in view of the prior decisions above cited to the contrary of the rule there laid down, and the general apparent acquiescence in those decisions by the courts and by the people, that we ought to hold, in accordance with those decisions, that, in a case where third persons are beneficiaries, intentional suicide of the insured while sane does not avoid the policy, in the absence of any provision in the policy to that effect. Whether the rule would apply to a case where the personal repre-

sentatives of the insured were bringing the action for the benefit of the estate of the insured is not decided, because that case is not before us. In so holding, it becomes unnecessary to consider the effect of the incontestable clause upon this branch of the case.

We now come to consider the effect of the clause providing that death "in consequence of, or in, violation of law" is not a risk covered by the policy. It is truly said that intentional suicide while sane was a felony at common law. It was punished by forfeiture of goods, but, as we do not inflict such punishments, it is now little more than the shadow of a crime. Technically, it is still a crime in this state, because we have retained the common law so far as it is not inconsistent with our laws and general situation, but it is not a crime within the ordinary meaning of the term, or any usual definition, because we have no statute punishing either suicide or attempted suicide. Mr. Bishop's definition of a crime (1 Bish. New Cr. Law, § 32) is "any wrong which the government deems injurious to the public at large, *and punishes through* a judicial proceeding in its own name." This was approved by this court in *Petition of Bergin*, 31 Wis. 383. Such is undoubtedly the general conception of a criminal offense, namely, a violation of law for which there is a punishment. Words are to be understood in their generally understood and accepted meaning. Now, as before said, the insurance company have deliberately struck out the usual suicide clause from their policy, and put in an "absolutely incontestable" clause. Is it reasonable to say that they have in fact retained the suicide provision, artfully concealed under a form of words which not one person in a hundred would suspect meant to include it? We think not. The rule that in case of doubt or ambiguity the language used (being the company's own language) must be construed most strongly against it again applies. Certainly, if this

clause were held to include suicide, the language of the policy would be grossly misleading. *Kerr v. Minn. M. B. Asso.* 39 Minn. 174. The New York courts have held suicide not a crime, because common-law crimes have been abolished in that state. *Darrow v. Family F. Soc.* 116 N. Y. 537.

But it is further claimed by the defendant that the evidence tended to show a fraudulent scheme on the part of Patterson, when he took out his policy, to obtain insurance on his life for the purpose of thereafter committing suicide, and defrauding the company for the benefit of his children. Doubtless, this would be a good defense, if shown, unless it be cut off by the "incontestable clause." It would be a defense not based on the suicide alone, but on the whole fraud, of which the act of suicide was only the ultimate step. But the difficulty is that we have been unable to find any evidence which would justify the submission of that question to the jury. It is said that he falsely represented his state of health in his application, and concealed some of the grounds upon which he had previously made application for a pension. There does not seem to be much merit in the claim. He submitted himself for examination to the company's medical examiner, who reported that he had dyspepsia, and that he was only a second-class risk. The company had full notice that he was not in first-class health, because the insured himself stated in his application that he had dyspepsia, and had had malaria, and had applied for a pension on the ground of indigestion brought on by exposure in the army. Besides, the incontestable clause would seem to effectually bar this defense. If this clause be not altogether a glittering generality, put in for no purpose except to induce men to insure, it would seem that it must cover such misstatements or omissions as are here alleged. Such clauses have been upheld by various courts. *Wright v. Mut. B. L. Asso.* 118 N. Y. 237; *Simpson v. Life Ins. Co.* 115 N. C. 393; *Goodwin v. Provident S. L. Ass. Asso.* 97 Iowa,

Welty vs. The Lake Superior Terminal & Transfer R. Co.

226; *Kline v. Nat. B. Asso.* 111 Ind. 462. We see no reason why an insurance company may not take the risk of ascertaining for itself the condition of health of the insured.

*By the Court.*— Judgment affirmed.