### NEW YORK LIFE INS. CO. v. STREET.
### (No. 8529.)

(Court of Civil Appeals of Texas. Galveston. June 3, 1924. Rehearing Denied Oct. 9, 1924.)

**1. Reformation of instruments ⬅45(1)—One seeking reformation has burden of clearly establishing mutuality of mistake.**

One seeking reformation of instrument has burden of clearly establishing that mistake relied on was mutual.

**2. Insurance ⬅143(3)—Erroneous statement of cash surrender value on face of policy held not mutual mistake.**

Mistake of insurance company in stating an erroneous cash surrender value on face of its policy *held* not mutual between it and insured, though from a table contained in policy correct surrender value could have been determined.

**3. Insurance ⬅151(2)—Application for policies subsequently rejected held not part of contract for policy accepted.**

Application in response to which two $10,000 policies were issued and rejected *held* no part of contract evidenced by $5,000 policy subsequently accepted, and recitations therein could not affect insured's cash surrender rights on policy accepted.

**4. Insurance ⬅143(8)—Insurer held estopped to assert after 14 years error in statement of cash surrender value on face of policy.**

Insurance company, which for 14 years accepted premiums on a 15-year payment policy, *held* thereafter estopped to assert in suit to re-

form policy that cash surrender value stated on its face was erroneous; such cash value having been a material factor, inducing insured to keep policy in force during its latter years.

**5. Insurance ⬅143(8)—Denial to insurer of right to modification of contract held not violation of public policy or statutes prohibiting discrimination.**

Where mutual insurer for 14 years accepted premiums on policy which stated on its face a cash surrender value in excess of that allowed on similar policies, it was not violation of public policy nor of statutes forbidding discrimination between persons of like classes to deny to it right to modification of contract.

**6. Insurance ⬅143(8) — Equity may enforce contract discriminating between policy holders, though it was inhibited by statute.**

Though insurance company cannot legally discriminate between policy holders of same class and expectancy, it does not follow that court of equity will always decline to enforce contract inhibited by statute regardless of circumstances and relations of parties.

**7. Insurance ⬅55—Purchase of policy of mutual company does not render purchaser a stockholder.**

One purchasing policy of mutual insurance company *held* not by that act alone to have become a stockholder in company, chargeable with notice of mutual features in its charter.

**8. Insurance ⬅55—Status of stockholder can arise from consent expressed or implied.**

Status of stockholder in mutual insurance company can arise only by consent expressed or implied.

Error from District Court, Harris County; W. E. Monteith, Judge.

Action by the New York Life Insurance Company against Gustavus C. Street. Judgment for defendant, and plaintiff brings error. Affirmed.

Locke & Locke and Paul M. O'Day, all of Dallas, for plaintiff in error.

Baker, Botts, Parker & Garwood, of Houston, for defendant in error.

GRAVES, J. From the statement in plaintiff in error's brief, concurred in by defendant in error as substantially correct in so far as concerns the nature of the case and the general line of the testimony introduced, this much is quoted as reflecting the status of the cause on appeal:

"This suit was instituted by the New York Life Insurance Company to secure the reformation of a policy issued by it to the defendant in error on June 6, 1906. This policy provided for the payment of dividends for a period of 15 years, at which time, according to its terms, it would have a guaranteed cash value of $2,650, together with such dividends as might be apportioned to it. It was asserted that as a result of a mutual mistake such guaranteed cash value was inserted in the policy, whereas the amount which should have been inserted was $2,035. The defendant in error de-

nied that there was any element of mutuality in such mistake, if any; that the mistake, if any, was due to the negligence of the plaintiff in error; that the failure to discover it was due to the laches and negligence of the plaintiff in error, and for these reasons the plaintiff in error was not entitled to the relief prayed for.

"In addition, the defendant in error filed a cross-action against the company asking for judgment for the amount appearing on the face of the policy as the cash surrender value, $2,650, interest, etc., which the company claimed it ought not to be compelled to pay.

"The evidence on behalf of the company showed substantially as follows: In March, 1906, the New York Life Insurance Company was represented at Houston, Tex., among others, by J. R. Parks and Boone Gross. These agents induced Mr. Street to make application in writing to the company for $10,000 of insurance on his life on the 20-year accumulation plan. Exhibit A attached to the company's complaint, and which it is admitted need not be reproduced in the statement of facts, contains these questions and answers:

"Question: Do you desire a policy on the accumulation plan, on the form and in the class corresponding with the value as to longevity which the company may put on your life? Answer: Yes.

"Question: If so, which accumulation period do you select? Answer: I select the 20-year accumulation period.

"In accordance with this application the company thereupon issued a policy in the sum of $10,000 upon the life of Mr. Street which provided a guaranteed cash value of $5,300. This, according to the letter of the two agents, the insured refused to accept on account of the fact that he evidently preferred a 15-year, rather than a 20-year, accumulation period. Being then 53 years old, it was natural that he should not desire to continue the payment of premiums until his seventy-third year. In accordance with the suggestion made by the agents, Gross and Parks, the company thereupon issued its policy No. 2260602 in the amount of $10,000 with an accumulation period of 15 years instead of 20 years. This policy provided that the guaranteed cash value of the policy at the end of its accumulation period should be $4,070.

"This policy, according to the letter of Parks and Gross, Mr. Street was unwilling to accept. However, according to their statement, he did tacitly agree at that time, to wit, on or about May 15, 1906, to accept a $5,000 policy, with the option of a cash settlement at the end of 15 years.

"Thereupon the company issued its policy No. 2263194 in the same form as policy No. 2260602, except that it was in the principal sum of $5,000. It too had an accumulation period of 15 years, but in filling out the blank space at the bottom of the first page of the policy, wherein the amount of guaranteed cash value is inserted, by clerical error and mistake the sum of $2,650 was inserted instead of the proper sum, $2,035.

"When the original application was received, a so-called figuring slip was prepared, upon which the annual premium was calculated in accordance with the character of the policy to be issued; the premium was $553.50 and the guaranteed cash value $5,300 on the 20-year accumulation period. When the policy No. 2259682, issued in accordance with this figuring slip, was returned as unaccepted and the issuance of another policy requested, a change slip was prepared by the proper official, which shows that the guaranteed cash value at the end of the 15-year accumulation period was $4,070, though the yearly premium of $553.50 remained unchanged. Policy No. 2260602, issued in pursuance of this change slip, having been returned for the issuance of a $5,000 policy for the same accumulation period, another change slip was prepared. It will be observed that two policies were issued on the 15-year accumulation plan with an annual premium of $276.75, but with a guaranteed cash value of $2,650. At this point, it will be noted, the error crept in. The guaranteed cash value should have been but one-half of the value of policy No. 2260602 as indicated by the change slip appearing at page 70 of the statement of facts. The writer of the change slips accounts for his error by saying that the majority of policies of this kind provided for the 20-year accumulation period, and that automatically and without thinking he inserted the wrong value in the change slip, which was duly copied into the policy by the clerk whose duty it was to follow the instructions embodied in such change slip. This policy delivered to Mr. Street was accepted by him, and for 14 years he paid the premiums provided for.

"The error was never discovered until near the end of the accumulation period. Then when an effort was made to figure the amount of guaranteed cash value due on the policy (and this by means of use of the change slip), it was observed for the first time that an erroneous guaranteed cash value had been incorporated in the change slip. Naturally it was assumed by the company that the policy had been erroneously prepared in accordance with the erroneous change slip, and thereupon, just one year before the termination of the policy, the New York office informed W. W. Watts, the company's cashier at St. Louis, to secure the return of the policy to make the correction. Watts replied that he had written three letters to Mr. Street but had not received a reply. Subsequently, on August 25th, Mr. Watts transmitted to the New York office a letter of Mr. Street which explains his position then and now; hence this litigation.

"The New York Life Insurance Company is a mutual insurance company, it has no capital stock of any kind, and all profits derived from all policies of the same class and equal expectation of life receive the same benefits for the premiums paid. The amount of the guaranteed cash value due on this or any other type of policy at the end of the premium-paying period is the amount of the reserve then outstanding. The premium charged on the policy issued to the defendant in error, Gustavus C. Street, was the regular premium rate per thousand dollars of insurance charged by the company to every other policy holder of the same class and of equal expectation of life. The reserve upon the policy in suit at the end of the 15-year accumulation period was $2,035, and the sum of $2,035 was the sum entered in the appropriate blank space in each policy as the guaranteed cash value, exclusive of profits, of every other contract made by the New York

Life Insurance Company with every other policy holder of the same class and equal expectation of life as Mr. Street; provided, of course, that the principal sum was for $5,000 and a proportionate sum, if the insurance was for more or less than $5,000. The reserve or guaranteed cash surrender value at 'the end of the premium-paying period upon a policy of insurance is a sum calculable with definite mathematic certainty, never subject to the slightest fluctuation.

"At no time during the year 1906, or at any other time, did the company ever have a premium rate which, in a policy taken out at the age of 53, insuring one for $5,000, would give a cash value of $2,650 at the end of a 15-year accumulation period. While such a policy could, of course, have been written, no reserve could have been accumulated upon such a policy sufficient to give such policy a cash value of $2,650 upon the premium charged, to wit, $276.75. If 'a reserve of $2,650 had been accumulated at the end of a 15-year period it would have required an annual premium of $308.30.

"Furthermore, 'the company settled all the class of policies which were taken out in the year 1906 on the 15-year accumulation plan by paying the policy holder as a guaranteed entire cash value the sum of $2,035 where the policy insured for $5,000, and by paying a proportionate sum according as 'the sum insured was more or less than $5,000, and by paying in addition to such entire cash value the cash dividend then apportioned by the company; such settlement being in accordance with the benefit that the policy holder selected.' Such, in brief, is 'the pertinent evidence introduced on behalf of the plaintiff.

"The defendant in error, G. C. Street, testified that he accepted the policy in good faith; that he had no recollection of his having signed an application for a 20-year policy in the first instance and his subsequent acceptance of a 15-year policy, but that he was satisfied that such statement was correct; that at the time of the delivery of the policy he did not know or have any actual information to the effect that the cash surrender value stated therein was incorrect, but thought it was correct, no statement to the contrary being made to him at the time. He received his premium notices from year 'to year, and as often as he received them he paid the premium on his policy. The attention of Mr. Street having been called to the fact that the policy provided on the tables at page 2 that at age 53 the cash loan available on the policy for each $1,000 at the end of the 14-year accumulation period would be $407, or $2,035 for $5,000, he replied that he had never paid any attention to it before; that he had never noticed the apparent discrepancy; did not figure it; but took the policy in good faith.

"There were no issues involved 'except those affecting the $615, which is the difference between the two figures before given for the guaranteed cash value.

"A jury had been selected to try the case, but, to save time, it was agreed at the close of the evidence that the jury would find: (1) That at no time during the life of the policy did Street have knowledge of the fact that a mistake had been made in the insertion of an improper guaranteed cash value; (2) that Street paid his premiums in reliance upon the figure actually written in the policy; (3) that the mistake was due to the negligence of some clerk of the New York Life Insurance Company. The trial court took the matter under advisement, ultimately rendering judgment for the defendant on his cross-action for the $615 involved, with interest, and denying the plaintiff the relief sought."

Plaintiff in error, in attacking here the adverse judgment below, contends in its brief that the mutuality of the mistake declared upon, and which it insists entitled it to the relief sought, arose out of these circumstances:

"First. The assured applied for a fifteen-year accumulation policy. The undisputed evidence shows that no representation had been made to him that the guaranteed cash value would be $2,650; therefore, it must be assumed that it was his intention that the company should insert therein the proper figure, whatever it might be, even though he was actually ignorant of the sum.

"Second. The assured, by examination of his policy, could have ascertained that the guaranteed cash value of the policy, stated to be $2,650, is contradicted by the figures on the second page of the policy, which show that the value of the policy, available for a cash loan, was $2,035; in either instance the amount of the reserve on the policy was five times $407, or $2,035; the assured is conclusively presumed to know the contents of his contract, and therefore, in contemplation of law, knew that his policy contained a mistake.

"Third. The statutes of the state of Texas and the state of New York, as well as the public policy of the two states, forbid a discrimination in rates or benefits granted to an insured. This provision in the statutes and the accepted public policy voiced therein can be made effective only by means of imputing to the insured an intention to abide by the law and to seek for himself no greater benefits than can be conferred on other insureds of the same class and of equal expectation of life.

"Fourth. The plaintiff company is a mutual life insurance company, has no stockholders, no persons have any interest in its dividends, except its policy holders and these exactly in proportion to the amounts which they have contributed to the company in the payment of premiums; therefore it is unconscionable that one assured be permitted to withdraw from the company a greater sum than any other, when the payment of premiums has not been in equal proportion. If Mr. Street be permitted to withdraw from the funds of the company the sum of $615 in excess of the amount which his premiums have earned, and $615 in excess of the sum allowed other insureds of the same class, such payment may be made only by means of depriving other insureds of a proportion of the sums which their policies have actually earned; in other words, Mr. Street wants something which his policy has not earned, and which he knew it could not earn; in addition, he wants to take it away from the earnings of other policies, for this is the only manner by which he can receive what he asks."

It further asserts that it is not now estopped to ask the reformation of the policy

prayed for, despite the delay of 14 years during which it permitted the insured to pay his premiums in reliance on the figure actually written in the policy and without knowing that one of its clerks had negligently inserted an improper guaranteed cash value, on the ground that "the doctrine of estoppel has no application," where, as in this instance, "sound public policy demands that no discrimination be made in favor of one assured at the expense of others of the same class."

The defendant in error, on the other hand, replies that the mistake contended for was not mutual, in that there was none upon his part; that the negligence and laches of the insurance company would prevent the reformation sought in the circumstances, even if there ever had been proper cause for one, and further—

"III. The insurance company, having issued a policy containing a provision that the same was incontestable, and having accepted all premiums due under the contract, is now estopped from claiming that a mistake was made in writing the policy; it being shown that one of the material inducements leading the insured to keep this policy in force was the amount of the guaranteed cash surrender value stated therein.

"IV. There is no public policy or statute of the state of New York or of Texas which would require or justify the reformation of this policy.

"V. The defendant in error, Street, as a policy holder, did not become a member of the corporation known as New York Life Insurance Company in the sense that he was bound by or charged with notice of the mutual features in its charter."

We have duly considered the statement of facts brought up with the record, together with the above-copied agreement as to what the jury would have found; they reflect the correctness of plaintiff in error's quoted recitation as to the main facts underlying the cause and we so determine; there will, however, be added, as our discussion proceeds, such additional findings from the body of the evidence as are deemed material and appropriate in deciding the several questions raised.

Mainly upon three conclusions we hold that the trial court's judgment must stand: (1) The mistake on which the action was grounded was not shown to be mutual, but that of the insurance company alone; (2) in the circumstances appearing, the defendant in error's plea of estoppel constituted a good defense against the suit; (3) No public policy of the state of Texas stood in the way of the enforcement of the contract as written.

[1] The burden is clearly upon one seeking reformation of a written instrument on that ground to show by clear, convincing, and satisfactory proof that the mistake relied upon was a mutual one. 34 Cyc. pp. 980, 984; Railway Co. v. Shirley, 45 Tex., at page 377;

Raby v. Greater New York Dev. Co., 151 App. Div. 72, 135 N. Y. Supp. 813, affirmed by New York Court of Appeals 210 N. Y. 586, 104 N. E. 1139.

[2] Under the agreed stipulation here not only was there no mistake in fact upon the insured's part, but at no time during the life of the policy did he even know that the insurer had, through its own negligence, made one, paying throughout the entire premium-paying period all amounts due from him under the contract "in reliance upon the figure actually written in the policy"; if this did not constitute a continuing assurance to him during all that time from plaintiff in error that there had been no mistake, as seems to us was the case, since the guaranteed cash surrender value as being $2,650 appeared in bold type on the front page of the policy itself, it certainly reduced the claim for mutuality in the error alleged to the single circumstance that on its second page there appeared a long list of tables from which, by a process of calculation, it could be determined that the loan value of the policy at the end of the 15-year period would be only $2,035; but even then it would be further necessary for the policy holder to know, either actually or constructively, that the loan value and the guaranteed cash surrender value were always the same, that each was based upon and constituted merely a synonym for the reserve, and that this latter sum was "calculable with definite mathematic certainty, never subject to the slightest fluctuation." As the introductory statement has incompletely indicated, however, the undisputed facts upon these features are that Mr. Street actually knew nothing about them, his uncontradicted testimony being—

"I got this policy in good faith, and I read what the value of it was; of course I didn't know anything about the statistics and tables. I saw that the policy was incontestable, and I thought it was a good policy, and I have kept it up since. I never heard of any question about this amount being incorrect until after I had paid the 15-year premiums and notified the company that I wanted to cash in this policy. At the time of the delivery of the policy I did not have any indication that the amount of the cash surrender value stated therein was incorrect. I thought it was correct. There was nothing said to me by the agent or otherwise that would indicate that the amount of the guaranteed cash surrender value stated in the policy was not correct. I don't know what, according to the company's tables, would have been the correct cash surrender value of the policy. I didn't figure that, I was a very busy man at that time. I was in business here, and I didn't go into that. The main thing with me was the amount of money I was to be insured for, the policy I was going to buy, and, if I lived the 15 years, what I was going to get; those are the main things I looked at. * * *

"I noticed that on this policy there was the statement that 'the company guarantees that the entire cash value of this policy at the end of the accumulation period shall be two thou-

sand six hundred and fifty dollars.' As to whether I saw the statement on the second page of the policy that the cash loan available at any time on each $1,000 of this policy, at age 53, would be $407 for each $1,000, I will say that what I believe about the matter is that I have seen more of that thing since this controversy came up than I did before. I never paid any attention to it before. I did not notice that there was an apparent discrepancy between the two; I never figured it; I took the policy in good faith. I would not say that I did know what figures were going to be placed in this policy when I sent in that application, but I must have known it or I would not have accepted it."

To say, under these conditions, and despite this affirmative representation of $2,650 on the first page of his contract, that the extended set of internal tables and the complicated calculations possibly deducible from them constructively charged the defendant in error with knowledge that a different and smaller amount was really correct, in our opinion requires of him a degree of ratiocination the principles of equity do not sanction. No such "clear, convincing, and satisfactory" case for the interposition of so drastic a remedy as the reformation of a long-standing written contract is made out by so doubtful a circumstance.

Neither do we think these considerations are inveighed against by the further circumstance that the original application of defendant in error called for a $10,000 policy on the 20-year accumulation plan, "on the form and in the class corresponding with the value as to longevity which the company may put on your life," despite the fact that the two policies in that amount shown in the foregoing statement to have been issued pursuant to it—the first for the 20-year period and the second reduced to 15 years—carried schedules of figures which indicated cash surrender values on a par with what is claimed should have been written into the policy in suit. The facts remain that both of these policies were rejected, the second one on account of objections thus stated in a letter from the local agents to the home office of the company:

"We have made repeated and strenuous endeavor to effect delivery of the above-numbered policy, but the insured has insisted from the beginning that the premium rate was too high. Some of his friends have advised him to take nothing but a term policy, maintaining that at his age no deferred dividend policy could possibly afford him satisfactory results, and, although we have argued the question with him fully and have shown him the most attractive figures, it seems impossible to place the policy as written,"

—and that no contract at all was entered into between the parties until subsequently, when Mr. Street, after having examined the $5,000 policy in suit, and "found its terms satisfactory" (including the assurance that it would at maturity be worth $2,650), decided to accept it as so written, and thereupon did so, paying at the same time the initial premium.

[3] In these circumstances we do not think this original application, in response to which the two rejected $10,000 policies were issued, could in any proper sense be regarded as a part of the contract evidenced by the $5,000 policy in suit, or, merely because of the before-quoted provisions and the general reference therein to the company's "class AA accumulation policy," as binding the assured under this later $5,000 policy he finally accepted to a talisman that would lead to a different value at maturity than that concretely and affirmatively stated on its face. But, if that view is unsound, then we think the substance of the situation presented and the principle applicable, while the analogy is not complete, is not in legal effect different from that which ruled the New York case above cited (Raby v. Development Co., 151 App. Div. 72, 135 N. Y. Supp. 813); there the preliminary memorandum to a contract for the sale of real estate through agents for the selling company recited that the sale was to be upon the regular terms and conditions established by the agents and according to their regular form of contract, but, when the contract itself was subsequently executed providing that on performance by the purchaser the land would be conveyed to him by deed, a form for which was attached and made a part of the contract, there was no reference to any restriction against the land, and the deed form annexed, by mistake of its agents, was not the one usually inserted by the grantor providing for restrictions; in upholding the refusal of the lower court to grant the seller's prayer to reform the conveyance so as to provide for the restrictions it customarily placed upon sales of such land, the court said:

"There is no proof of any overreaching on his part or of any attempt thereat or of his knowledge, actual or imputable, that there was such a restriction to be put upon this land. The full probative force of the defendant's testimony is that there was a mistake on its part, in that it should have provided for this restriction on account of the relative location of this land. The court can only act in reformation upon 'substantial and most convincing proof' (Christopher St. Railroad Co. v. Twenty-Third Street Railroad Co., 149 N. Y. 51, 43 N. E. 538) that it was the intention of both parties to make the agreement as reformation would have it, and that this intention was frustrated by fraud, accident, or mutual mistake. It is not enough, therefore, to show the intention of one party. The court will not reform if the negligence of the party asking relief was the cause of the mistake. Jackson v. Andrews, 59 N. Y. 244; Avery v. Equitable Life Assur. Society, 117 N. Y. 451, 23 N. E. 3; Braman v. Bingham, 26 N. Y. 483. If the mistake was due to the error of the defendant's servants, draftsmen, or scriveners, the defendant cannot

265 S.W.—26

invoke the rule of Born v. Schrenkeisen, 110 N. Y. 55, 17 N. E. 339, and like cases, for the reason that such rule but obtains after it has been established that there was no mistake in the agreement itself. The prayer for reformation was properly denied."

[4] We think 'it equally plain that' enough was here shown, not only to raise an estoppel to claim it against the insurance company, but also to have made a reformation in its favor inequitable; in addition to the above copied agreed facts, admitting the mistake to have been attributable solely to the company's negligence and its allowing the insured, in complete ignorance of any such error, to pay his full premiums throughout the life of the policy in reliance upon its written figures upon the face thereof as being the correct ones, it was further shown that at all times after the policy was issued the company had in its office a memorandum or file, which, if it had been consulted, would have disclosed precisely what the error was; and that the policy contained in large and prominent type this provision: "This policy is incontestable."

In this connection the defendant in error also testified:

"The amount of the cash surrender value of the policy was a material factor in my keeping this policy during the latter years of its existence, and I can illustrate that. I had a policy in the Mutual Life which became due, and I did not renew that policy, although it was on better terms for the same amount than this one was. I had a five thousand dollar policy with the Mutual Life, but I felt it was better to keep this one, although I was paying a larger premium on that. I paid them fifty-four dollars less than what I was paying on this policy. I think this policy was two hundred and seventy-six something and the other was, I think, fifty-four dollars less."

Despite these conditions, the plaintiff in error sat inertly by for 14 years, collecting all the while its premiums but making no check or examination of its records with reference to this policy, and raising no question about the correctness of the figures carried so plainly upon its front page until June 18, 1920. It is thus made entirely clear, we think, that the mere lapse of the time that ran off was not the only basis for an estoppel, as plaintiff in error argues before this court; upon the contrary, the evidence undisputedly establishes that the $2,650 cash surrender value so stated in the policy itself was one of the material considerations inducing the insured to keep the contract alive, especially so during the latter years of its existence.

We think the following authorities substantiate the conclusion expressed: 34 Cyc. 948, 990; 26 Corpus Juris, Fire Insurance, § 105; Cole v. Kjellberg (Tex. Civ. App.) 141 S. W. 120; St. Paul F. & M. Ins. Co. v. Shaver, 76 Iowa, 282, 41 N. W. 19; Man-hattan Life Ins. Co. v. Stubbs (Tex. Com. App.) 234 S. W. 1104; Forman v. Mutual Life Ins. Co., 173 Ky. 547, 191 S. W: 279, L. R. A. 1918F, 330, Ann. Cas. 1918E, 880; Union Central Life 'v. Fox, 106 Tenn. 347, 61 S. W. 62, 82 Am. St. Rep. 885; Patterson v. Natural Mutual Life, 100 Wis. 118, 75 N. W. 980, 42 L. R. A. 253, 69 Am. St. Rep. 899; note under Duvall v. National Life Ins. Co., L. R A. 1917E, 338.

[5, 6] As to the plaintiff in error's contention that an estoppel so grounded has no application here because the public policy of both the states of New York and Texas forbids discrimination in favor of one assured at the expense of others of the same class, we think the question is foreclosed the other way, in so far as Texas is concerned, by the decision of our Supreme Court in American National Insurance Co. v. Tabor, 111 Tex. 155, 230 S. W 397, nor has it been made to appear to us that the law is any different in New York. It may be readily conceded that an insurance company cannot legally discriminate between policy holders of the same class and expectancy, but it does not follow that a court of equity will always decline to enforce a contract which is inhibited by statute, whatever the circumstances and the relations of the parties; on the contrary, as declared by our Supreme Court in the Tabor Case, at page 400, of 230 S. W.:

"The rule is established that a court of equity will not withhold relief where it is necessary in the interest of justice and of sound public policy to enforce a contract which is inhibited by statute, but is not declared void and is not otherwise open to attack, provided the parties are not in pari delicto, and he who is least culpable seeks relief. 1 Pomeroy's Equity Jurisprudence (3d Ed.) § 403."

The court was there construing our statutes affecting this subject (R. S. arts. 4953, 4954, 4741, and 416c, White's Penal Code), which are not dissimilar to those of New York in effect at the time or at least during the year this policy was issued (chapter 690, Laws of New York 1892, § 89, also Laws of New York, 115 Session, 1892, vol. 1, c. 692, entitled An act to amend the Penal Code, §. 577b), in that, while the acts in both states prohibited discriminations between policy holders, they alike not only failed to declare policies in which that had occurred void, but also carried provisions making the policies incontestable after a prescribed time and imposing penalties for such discrimination as is here involved upon the insurance company alone; in discussing this particular feature our Supreme Court further said in the Tabor Case:

"We 'sanction the declaration of Judge Selden, quoted with approval in a later opinion of the New York Court of Appeals, that—

" 'It is safe to assume that whenever the statute imposes a penalty upon one party and none upon the other, they are not to be regard-

ed as pari delictum.' Tracy v. Talmage, 14 N. Y. 162, 67 Am. Dec. 145; Irwin v. Curie, 171 N. Y. 409, 64 N. E. 161, 58 L. R. A. 832.

"It would not be in accord with either the public policy declared by the act wherein the statute is found or the ends of justice to permit insurance companies to issue discriminatory policies of life insurance and collect and retain the premiums thereon and to then refuse payment after the death of the insured."

Since the Texas statutes under construction in the case thus quoted from make no distinction between mutual and stock companies, that decision authoritatively determines that the estoppel set up contravenes no public policy of this state; it likewise appears to demonstrate that none of the state of New York stood in the way.

The Louisiana case of Rougon v. Equitable Life Assurance Society, 146 La. 132, 83 South. 434, cited and relied upon by plaintiff in error, seems to us clearly distinguishable from the case here made.

[7, 8] In conclusion, we think it plain that defendant in error did not, as a mere holder of one of its contracts of insurance, become such a member of the New York corporation in which he took his policy as to be bound by or charged with notice of the mutual features in its charter. The record here is not only devoid of any evidence from which it could even inferentially be determined that Mr. Street at the time he took out this policy knew anything about the mutual character of the insurance company's organization, but repels such a suggestion; neither the name of the company nor the policy itself contained any intimation of such a condition; his relation was that purely of a policy holder, not in any sense that of a stockholder, which latter connection can only come about by the consent, express or implied, of the member. Ky. Growers Ins. Co. v. Logan, 149 Ky. 453, 149 S. W. 922; Greenlaw v. Aroostook Co. Patrons' Mutual Fire Ins. Co., 117 Me. 514, 105 Atl. 116; Independent Order of Foresters v. Cunningham, 127 Tenn. 521, 156 S. W. 192, 5 A. L. R. 1569; Watts v. Equitable Mutual Life Ass'n, 111 Iowa, 90, 82 N. W. 441; 14 C. J. p. 838; Fletcher, Cyclopedia Corporations, vol. 6, p. 3952 et seq.; 14 Corpus Juris, 848; Commonwealth Bonding & Casualty v. Curry (Tex. Civ. App.) 183 S. W. 1; Mann v. German-American Investment Co., 70 Neb. 454, 97 N. W. 600; Carey v. Williams, 79 Fed. 906, 25 C. C. A. 227; Elliott v. Safety Fund Life Association, 76 Mo. App. 562; Osius v. O'Dwyer, 127 Mich. 244, 86 N. W. 831; Lee v. Mo. State Life Ins. Co. (Mo. App.) 238 S. W. 858.

From what has been said it follows that the trial court's judgment should be affirmed; that order has been entered. Chief Justice PLEASANTS, being disqualified, took no part in this decision.

Affirmed.