MATTIE MARY PRIDE, Appellee, v. INTER-STATE BUSINESS MEN'S ACCIDENT ASSOCIATION OF DES MOINES, Appellant.

NOVEMBER 15, 1927.

168

*Fred B. Blair, Bronson & Charleton,* and *Nourse & Nourse,* for appellant.

*McCoy & Beecher,* for appellee.

Evans, C. J.—I. We are first confronted with a motion by the appellee to dismiss the appeal because not taken in time, within the provisions of Section 12832, Code of 1924. It appears  that the judgment was entered on April 1, 1926. The order overruling the motion for a new trial was entered on August 26, 1926. The appeal was taken November 26, 1926. Our present statute has reduced the time of taking appeal from six months to four months. The controversy is not at that point. Section 12832 provides as follows:

"Appeals from the district, * * * courts may be taken to the Supreme Court at any time within four months from the date of the entry of record of the judgment or order appealed from, and not afterwards; but when a motion for new trial, or in arrest of judgment, or for judgment notwithstanding the verdict has been filed, such time for appeal shall be automatically extended so as to permit the same at any time within sixty days after the entry of the ruling upon such motion."

Appellant does not claim to have appealed from the judgment, but only from the order overruling the motion for a new trial. The appellee contends that, because such appeal was not taken within four months from the entry of the judgment, nor within 60 days after the entry of the order overruling the motion for a new trial, the right of appeal was thereby wholly lost to the appellant. The contention for the appellant is that, because its appeal from the order overruling its motion for a new trial was taken within four months from the date of the entry of such order; it was in time, within the provisions of the statute above quoted. Appellee construes the quoted section to mean that an appeal from an order overruling a motion for a new trial must be taken either: (1) Within four months from the date of the entry of judgment; or (2) within 60 days from the entry of the order denying a new trial. Appellant construes the "60-day" provision of the statute as extending the time for appealing from the original judgment, and not as curtailing the time within which an appeal from an order denying a new trial may be taken.

It will be noted that the statute in question divides itself into two parts, which are separated by a semicolon. Except as "four months" is substituted for "six months," the first part of the section is a copy of Section 4110, Code of 1897. If this part of the section stood alone, then the appellant would have a right to appeal from the order denying a new trial within four months after the entry of such order. Such has always been our construction of Section 4110, Code of 1897. See *Frett v. Holdorf*, 201 Iowa 748. The second part of Section 12832, Code of 1924, does not purport to *curtail* in any respect the time for appeal stated in the first part thereof. It does purport to *extend* the same in a given event. How is such provision for extension to be applied in the construction of the statute as a whole? Keeping in mind the construction which we have always put upon Section 4110, Code of 1897, we think the effect of this later amendment was to extend the time of appeal *from the judgment,* so as to give the appellant 60 days therefor after the entry of the order denying the motion for a new trial. If, therefore, the appellant had appealed from the judgment within 60 days after August 26, 1926, it would have been in time. Nor, in such event would it have been necessary for it to appeal

from the order denying a new trial, in so far as its motion for a new trial was predicated upon the record of the trial. But it had a right of appeal from the order denying a new trial, under the provisions of Subdivision 3, Section 12823. And this is so even though it failed to appeal from the judgment itself. Having such right of appeal, it had the right, under the first part of Section 12832, to exercise such right of appeal "at any time within four months from the date of the entry of record of the * * * order appealed from." The appellant did appeal from such order within three months from the time of its entry. It was, therefore, in time.

II. We now turn to the questions raised on the appeal. The policy sued on was upon the life of Denby Pride. The beneficiary therein was the wife of the insured, who is the plaintiff  herein. The insured lost his life as a result of a gunshot wound inflicted about 1 A. M., Sunday, September 14, 1924, in his own dooryard. The first question is: Was it accidental or suicidal? If accidental, was the event witnessed, and was the accidental cause established by a person who saw the cause in operation, within the meaning of the policy?

The plaintiff introduced evidence tending to show that, for some weeks prior to the night in question, unknown persons had harassed and threatened the insured, and greatly disturbed the peace of his home by unlawful prowlings and trespasses. Letters had been received by him, threatening violence. Two of these letters are in evidence. One of them purports to be signed "K. K. K." The other is anonymous. These letters had been reported by the insured to the public authorities. Unknown persons had come upon his premises in the night, and had thrown stones against the house. On three previous occasions, beginning in July, he had arisen from his bed and gone out into his yard in search of the prowlers. On two occasions he had carried his small gun, of 22 caliber, but had not apprehended anyone. On the night of September 13th, he came home about 11 P. M. At that time, his daughter, a girl of sixteen, was entertaining a little party of friends, comprising five young couples. This little party was the aftermath of a fraternity banquet that had been held elsewhere earlier in the evening, where a class of boys was initiated into the De Molay fraternity. Representatives of this

fraternity were present from Dubuque, and perhaps other places. The party included some of the young men of Dubuque, who were waiting for a late train upon which to return to their home. The insured, being informed by his wife as to the nature of the party, went to bed; whereas the wife remained to await the termination of the festivities of the young people. The bedroom into which the insured went, adjoined the kitchen, where his wife was. Shortly thereafter, his wife observed him soundly asleep. At about 1 to 1:30 A. M., he arose from his bed, and passed through the kitchen into his back yard. His gun stood in the corner at the kitchen door, and was taken by him as he went out. He wore a pair of slippers, and was clothed in his nightgown. He appeared to be in search of something or someone. Two of the young men, Wolf and Washburn, were at that time out of doors, and about 40 feet distant from him. They saw him stoop over, apparently looking under the porch. He also looked behind a tree. While he was engaged in this kind of activity, each of them heard what appeared to be the crack of a rifle. He continued his apparent search for a short time thereafter, but finally sank to the ground. He was immediately carried to the house, and doctors were summoned. A bullet had penetrated his body from the left front side to the back. A few moments later, the gun was picked up from the ground at the place where he was when the rifle crack was heard. He died as a result of the wound, within a week. Wolf and Washburn each testified that he saw the insured only dimly in the dark; that he did not at the time know who he was; that he did not see the gun nor any powder flash therefrom. Wolf and Washburn are the witnesses on whose testimony the plaintiff relies, as meeting the requirements of the policy heretofore quoted. The contention for the appellant at this point is that such requirements of the policy are not met by such testimony. Concededly, the loss claimed for resulted from the discharge of the firearm. Did Wolf and Washburn, or either of them, "*see* the cause in operation at the time of the discharge?" The argument for the appellant is that these witnesses *saw* virtually nothing; that they simply heard a noise, which to them resembled that of a rifle shot; that, therefore, there was a complete failure of proof at this point. A directed verdict was asked on this ground.

The question naturally arises as to what an observer may

*see* when a gun is discharged and a bullet penetrates a near-by object. Surely he does not see the bullet. If the bullet be found in the body of a victim, it is not the eyesight of the witness that tells him where the bullet came from. ''The cause in operation'' is, of course, the passing of the bullet from the gun into the body of the injured person. If we accept the interpretation which the appellant puts upon its policy provision, it calls for an impossibility. No person could ever be in a position whereby he could see ''the cause in operation,'' within the meaning of such an interpretation. If such were the purpose of the appellant in the formulation of its policy, then it ought to have stated frankly that no recovery in excess of $100 should be paid for any loss sustained as a result of the discharge of firearms. But the policy purports to open the door to proof by disinterested persons whereby recovery may be had for the maximum amount named. We think, therefore, that it should receive an interpretation consistent with its apparent spirit and intent. This is that, in the given event, there must be some person who, by reason of his presence, can testify to his personal knowledge of the circumstances attending the event. If, from the testimony of such witness and from the inferences which can fairly be drawn from the circumstances testified to by him, a jury can fairly say that the discharge of the firearms was accidental, then the requirement of the policy is complied with at this point. Nor is the exercise by the witness of other senses than that of sight to be disregarded. This was the substance of our holding in *Ellis v. Interstate B. M. Acc. Assn.*, 183 Iowa 1279. It is true that the policy provision in that case was not identical with the one before us, but we think that both provisions are fairly subject to the same interpretation. Mere ingenuity in the shifting of terms in an insurance policy is not to be aided by judicial interpretations or distinctions. Actual cases involving this question are surprisingly rare. Appellee brings to our attention the case of *Lewis v. Brotherhood Acc. Co.*, 194 Mass. 1 (79 N. E. 802), which is well in point. It was there said:

''The clause seems to be of somewhat recent origin in policies of insurance, and our attention has not been called by counsel to any case, nor are we aware of any, except *National Accident Society v. Ralstin*, 101 Ill. App. 192, in which it has

received judicial attention. That case was one of shooting, and the injury was not fatal. It was held that the plaintiff, who was the injured person, was an eyewitness to his own injury. It was further said that an eyewitness to a shooting does not necessarily mean one who saw the load leave the gun. Before the insertion of this clause, the insurance companies labored under some difficulty in their defense. Especially was this felt in cases of death by drowning or shooting. * * * In an attempt to meet such cases, doubtless, a clause has been inserted in policies, providing, in substance, that there shall be no recovery in certain cases unless the claimant proves, by direct and positive proof, that the death or injury was caused by accident, and was not the result of design; or, in other words, was from a cause covered by the policy. But it was held that such a clause did not make it necessary that the facts and circumstances of the injury should be shown by persons who were actually present when the insured received the injuries, but that it was sufficient if they were shown by circumstantial evidence. * * * What does the clause mean? An eyewitness is a person who testifies to what he has seen. By the terms of this policy, the facts and circumstances of the accident and injury are to be established by those who saw them. Not only are the facts and circumstances of the injury to be established by an eyewitness, but also those of the accident,—that is, the operating cause of the injury. Enough must be testified to by eyewitnesses to show the operating cause of the injury, or at least to show that, at the time of the injury, there was an operating cause to which the accident may fairly be attributed, and to indicate in a general way the nature of that cause and the manner of its working.''

To the same effect is the case of *Bankers' Health & Acc. Assn. v. Wilkes* (Tex. Civ. App.), 209 S. W. 230.

We hold, therefore, that the testimony of Wolf and Washburn was sufficient to go to the jury as a purported compliance with the policy requirement specified.

We may add here that the pertinency of the recited events preceding the night of the shooting is not that they tend to implicate other persons in the shooting, but that they tend to account for the conduct of the insured consistently with the theory of accident.

III. Three doctors were called to attend the insured at the

time of his injury,—Doctors May, Jones, and Dittmer. The defendant called each of said doctors as a witness, and offered to prove by him certain statements made by the insured on the night of his injury concerning the method of the injury, and tending to show that it was self-inflicted. This offered evidence was objected to by the plaintiff, on the ground, among others, that the communication was confidential and privileged, within the meaning of the statute in such cases. Section 11263 provides:

"No practicing attorney, counselor, physician, surgeon, or the stenographer or confidential clerk of any such person, who obtains such information by reason of his employment, minister of the gospel or priest of any denomination shall be allowed, in giving testimony, to disclose any confidential communication properly intrusted to him in his professional capacity, and necessary and proper to enable him to discharge the functions of his office according to the usual course of practice or discipline."

These doctors were concededly attending the insured in a professional capacity. It is argued by the appellant, however, that the information thus given by the insured was not "necessary and proper to enable the doctors to discharge the function of their office." We have held repeatedly that we will draw no fine lines as to whether a communication is necessary or unnecessary. It is the policy of the statute to provide for great freedom of disclosure by a patient to his physician. The patient is not in a position to know what disclosure may be necessary and what may be unnecessary. He could know the distinction only by inquiry from the physician himself, or from other expert advice. All our previous cases take a broad ground upon this subject, and construe the statute liberally, to the protection of the confidence reposed by a patient in his physician. See *Prader v. National M. Acc. Assn.*, 95 Iowa 149; *Battis v. Chicago, R. I. & P. R. Co.*, 124 Iowa 623; *Hanson v. Kline*, 136 Iowa 101; *Roberts v. Hennessey*, 191 Iowa 86.

It is further contended by appellant, however, that the statutory privilege in question had been waived by the insured by a provision in his policy. The application for insurance made by the insured contained the following question and answer:

"Q. In so far as you are permitted to do so under the laws of the state in which you now reside, for yourself, and for your beneficiary, do you consent that any physician or surgeon *who has been consulted by you* may be examined touching any knowledge he may have acquired by reason of his relation to you, and give information in regard thereto pending the acceptance of this application, and in the event of any claim being made under the certificate to be issued on this application? A. Yes."

It is contended by appellant that by such application the insured waived the privilege of the statute on confidential communication. It is undoubtedly true that a patient may waive his privilege, and that he may do so by contract in advance. But it is contended by appellee that the proviso above quoted has no application to the particular question before us. It will be noted from a reading of the quoted proviso that the waiver speaks in the present and in the past tense, and that it does not in terms refer to future communications. The appellant construes this proviso as though it read as follows:

"In so far as you are permitted to do so under the laws of the state in which you now reside, for yourself and for your beneficiary, do you consent that any physician or surgeon who has been consulted by you [or may hereafter be consulted by you] may be examined," etc.?

The brackets are ours. We think appellee's position is well taken, and that the insured did not purport to waive the confidence of communications which he might thereafter make. The bracketed words are not in the proviso, and the appellant is not entitled to enlarge by interpretation the policy which was formulated by itself.

IV. The defendant produced the witness Smith, and offered to prove by him certain admissions made to him by the insured in conversation, which tended to support the claim of attempted suicide. Objection to the offer was sustained, as being incompetent and hearsay, and no part of the *res gestae.*

Appellant plausibly contends that the evidence was admissible as being an admission by the assured, who was the only person in interest in the control of the policy at the time the

 admission was made, and that, therefore, it was not hearsay. It is the settled law of this state that the beneficiary of an insurance policy takes under her own right, and not as representative of, or through, the assured; and that the declarations of the insured are not binding upon her. *Vernon v. Iowa S. T. Men's Assn.,* 158 Iowa 597; *Sutcliffe v. Iowa S. T. Men's Assn.,* 119 Iowa 220; *Seiler v. Economic Life Assn.,* 105 Iowa 87; *Parker v. Des Moines Life Assn.,* 108 Iowa 117. To the same effect, see *Maine v. Maryland Cas. Co.,* 172 Wis. 350 (178 N. W. 749); *Patterson v. Natural P. M. Life Ins. Co.,* 100 Wis. 118 (75 N. W. 980); *Rawson v. Milwaukee Mut. Life Ins. Co.,* 115 Wis. 641 (92 N. W. 378).

The rule is not without its salutary reasons. Ordinarily, a beneficiary is in no position to disprove or to deny alleged admissions of the deceased insured. The rule has its application, not to transactions between the insured and the insuring company, but to the conversations or statements of the insured with, or to third persons.

It is further urged, however, by the appellant that this evidence was admissible as a part of the *res gestae.* The trial court held that it was not. More than two hours intervened after the  event before the alleged statement was made. The lapse of time would not of itself bar consideration of the evidence as *res gestae,* but the time expired is not of itself the criterion. No hard and fast rule has ever been laid down, to determine what hearsay statement may or may not be deemed *res gestae.* The question is one which is addressed very largely to the sound discretion of the trial court. We have seldom interfered with the exercise of such discretion. *Lynch v. Egypt Coal Co.,* 190 Iowa 1272; *Clark v. Van Vleck,* 135 Iowa 194; *Armil v. Chicago, B. & Q. R. Co.,* 70 Iowa 130. In the latter case we said:

"It is difficult, if not impossible, to say definitely what constitutes a part of the *res gestae.* No absolute rule is or can be established in relation thereto. A discretion is and must be reposed in the court, and therefore each case must largely depend upon the circumstances surrounding the transaction * * * ."

Upon the record before us, we would not be justified in reversing the ruling of the trial court at that point. See, also,

*State v. Deuble*, 74 Iowa 509. In that case we reversed the trial court.

What we have here said, is alike .applicable to the offered testimony of the witness Leighton. The foregoing comprises the principal assignments argued. We find no reversible error in the record.

The judgment below is, accordingly, affirmed.—*Affirmed.*

DE GRAFF, ALBERT, MORLING, and WAGNER, JJ., concur.