Kaufman, Appellant, v. New York Life Ins. Co.

274

Argued October 18, 1933.

Before TREXLER, P. J., KELLER, CUNNINGHAM, BALDRIGE, STADTFELD, PARKER and JAMES, JJ.

*Simon Pearl,* and with him *Henry Arronson,* for appellant.

*Arthur G. Dickson,* for appellee.

OPINION BY CUNNINGHAM, J., December 16, 1933:

This appeal is by the plaintiff below from a judgment entered "upon the whole record" in favor of the defendant life insurance company in an action by which appellant, as the insured, sought to recover the sum of $420. For the purpose of this appeal, that amount may be treated as a balance of the "cash surrender value" which appellant averred was still due him under the provisions of his policy. At the conclusion of the trial, counsel agreed there were no issues of fact for the jury.

The substantial question here involved does not seem to have been definitely ruled by our appellate courts. It arises out of these circumstances.

On July 21, 1910, defendant issued to appellant, then twenty-one years of age, a "Twenty Payment Life Policy" in the amount of $2,000, in consideration of the payment by him of an annual premium of $60.04. In a printed "Table of Loan and Surrender Values" upon the third page it was stated, inter alia, that the cash surrender value, "after policy has been in force" twenty years, would be $678 for each $1,000 of insurance.

Appellant paid the stipulated premium regularly for twenty years and then elected to take the cash sur-

render value of his policy and demanded $1,356—the amount indicated upon the face of the contract.

It was then discovered by defendant for the first time that, by mistake, it had utilized a printed form of policy intended for applicants aged forty-one, and that if it had used the proper form the cash surrender value, as set out in its rate book for 1910, would have appeared thereon as only $468, per thousand of insurance, or $936 for a two thousand dollar policy at the end of the twenty year period. The difference of $420 is attributable to the fact that an insured forty-one years of age would pay a higher annual premium, thereby creating a greater equity.

Two grounds of defense were asserted: First, that a mutual mistake had been made by the parties, which entitled defendant to a reformation of the contract; and second, that the statutes of this state, in force at the time the policy was issued, forbade such a discrimination between appellant and others of like age as would exist if he were allowed to recover the higher cash surrender value. The court below adopted both of these contentions in its memorandum opinion. For the reasons presently stated, we are unable to agree with either conclusion.

As was said in Boyce v. Fire Insurance Co., 24 Pa. Superior Ct. 589: "It is a settled rule in equity that where the court is asked to reform the written evidence of a contract, the mistake must be mutual ...... A court of equity has not power to reform an agreement; it can only correct the written evidence of the agreement to make it correspond to the understanding of the parties."

The court below found such a mutual mistake existed because, to quote from its opinion, "both parties hereto contracted with reference to the existing published rates, and both intended that the policy as issued and delivered should conform to such rates; neither in-

tended that the plaintiff should receive a benefit from his policy that every other policy-holder of the same class could not receive." The difficulty we have with this conclusion is that it is not supported by the facts. These indicate merely that appellant made written application for a twenty payment policy in the amount of $2,000; that a policy was delivered to him showing the cash surrender value which he now claims; and that he continued to pay the premium for a period of twenty years, in the belief that he would receive the benefits set forth in that policy. There is no evidence that appellant, before taking out the insurance, was informed as to what the cash surrender value at the end of any given year would be.

In several instances the court below uses the expression, "published rates," and, "existing published rates," of the defendant company. Under the evidence, the rates of defendant in 1910 were not "published" in any correct sense of that term. They were merely printed in a "rate book," furnished agents and employes of defendant, and were filed with the Insurance Commissioners of the states in which it was doing business. Appellant testified positively, and without contradiction, that the agent of defendant who obtained his application for the policy did not show him "any rate book," and that knowledge of its contents was never communicated to him. The presumptions attendant upon a contract by a patron with a public utility which has filed, posted and published, its rates do not arise in this case. Under all the circumstances, we think it cannot properly be said that appellant consciously "intended" to contract with reference to any of defendant's then existing rates, except the annual premium rate, or that he had any knowledge concerning the "relation between premiums paid, surrender values and reserves," stressed by the court below. His intent, to be significant, must have been a par-

ticular intent; and the only evidence of an intent of that character was his request for a $2,000 twenty-payment policy. Indeed, if any inference is to be drawn, the normal one would be that he intended to keep in force a policy which guaranteed the exact payments shown therein.

The facts do not disclose an antecedent agreement to fix the cash surrender value at the figure now put forward by the defendant and an inadvertent substitution of other figures, contrary to the intention of both parties. We therefore conclude that no such mutual mistake existed as would justify a reformation under the settled principles of equity jurisprudence.

Defendant has cited several decisions from other jurisdictions, in which reformation was decreed to permit the correction of clerical or actuarial mistakes. The ostensible reason given in support of reformation in certain of these cases is in harmony with defendant's argument that a mutual mistake existed because the insured, in each instance, must have intended to contract in accordance with the company's published rates; and defendant urges that this line of reasoning is equally applicable to the present case. As above stated, we are not convinced that the theory is correct in the normal situation. Moreover, a careful examination of the cases referred to will show that most of them are distinguishable upon their actual facts, which were such as to make recovery for the face amount of the policy clearly inequitable in those cases.

A brief reference to certain of them will make the distinction apparent. Thus, in Columbian National Life Insurance Co. v. Black, 35 Fed. (2nd) 571, (cited by the court below) application was made by the insured for a $10,000 policy. By mistake, the printer had used the form for an ordinary life policy for the first page, but on the reverse side had erroneously used the form for an endowment policy. Each of these had a

table of values setting out the options given to the insured at the end of each year. Under the table on the first page, the assured was correctly given an option of receiving $3,040 in cash at the end of twenty years, while under the provisions applicable to the endowment policy, he was given $10,000 in cash at the end of the same period. As the court correctly pointed out, there was a patent and manifest absurdity on the face of the policy, and reformation was consequently allowed to rectify the error.

In Hibbard v. North American Life Insurance Co., 212 N. W. 779 (Wis.), also relied upon below, the life insurance policy contained a table of cash surrender values, ending with the twentieth year at $4,640. The surrender value for the tenth year was $2,070. The policy also contained a series of four options, which by mistake were guaranteed at the end of ten rather than twenty years. One of these options allowed the insured to surrender the policy for cash payment of $4,640. Here again there was an obvious ambiguity on the face of the policy, since if the insured had read the document he would have discovered that the figures given in the table of cash surrender values were in direct conflict with the figures specified under the option provisions.

In Hemphill et al. v. New York Life Ins. Co., 243 S. W. 1040 (Ky.), the insurance company neglected to deduct the amount of money borrowed upon the original policy, and consequently gave the insured paid up insurance of $1,289 instead of $225.

In New York Life Ins. Co. v. Gilbert et ux., 256 S. W. 148 (Mo.), paid up insurance was given in the amount of $768, whereas it should have been $296.

In Buck v. Equitable Life Assurance Society, 165 Pac. 878 (Wash.), the cash surrender value through a clerical error was stated to be $1,000 instead of $408.

In Berry v. Continental Life Ins. Co., of Missouri,

33 S. W. (2d) 1016 (Mo.), the cash surrender value was stated to be $2,000, whereas it should have been $952.

It will be noted that these cases fall generally into two categories; first, those in which there was an obvious conflict between different clauses of the same policy, with the result that the insured could not be said to have been misled; and second, those in which the mistake was so great that an inference might easily have arisen that the insured must have recognized the error. If the facts of this case had brought it within either class, it might be held that the mistake could be corrected—not upon the ground that a mutual mistake existed, but upon the cognate ground that a mistake by one party, coupled with knowledge thereof by the other, may, under certain circumstances, afford a basis for equitable relief. "It has been held with obvious justice that a mistake by one party and knowledge of the mistake by the other, will justify relief as fully as mutual mistake:" Williston on Contracts, Vol. III, Sec. 1497; see also Sec. 1548.

This doctrine was applied in Cook v. Liston, 192 Pa. 19, 43 A. 389, where a deed was reformed in view of the fact that the grantee accepted it with knowledge of an error in the estate conveyed. However, if this doctrine be applied, there must be such knowledge of a mistake on the part of the party against whom reformation is decreed as to justify an inference of fraud or bad faith. We cannot hold that such an inference fairly arises in the present case. No ambiguity is apparent upon the face of the policy, and the discrepancy between the total amount of the premiums and the surrender value is not so great as to charge appellant with notice of an error. If there be any fundamental conflict of authority on this subject, we believe the better considered decisions to be those of New York Life Ins. Co. v. Kimball, 93 Vt. 147, 106 A. 676, and New York Life Ins. Co. v. Street, 265 S.W. 397 (Tex.).

We are also of opinion that the statutes against discrimination between policy-holders were not intended to defeat recovery in a case of this sort. The statute in effect at the date upon which this policy was written was that of May 3, 1909, P. L. 405. Its applicable provisions are appended in a foot-note.* It is aimed at two evils. It prohibits the giving of any rebates of premiums, or any other inducements not specified in the policy of insurance; and it prohibits any discrimination between policy-holders of the same class and of equal expectation of life. In Reed v. Phila., Life Ins. Co., 50 Pa. Superior Ct. 384, it was said that the statute is designed to give the advantage of life insurance to all persons upon equal terms, and is intended to protect the treasuries of insurance companies from depletion in favor of certain policy-holders and to the detriment of the interest of others.

Defendant contends that if recovery be allowed for the amount stated on the face of this policy, the intent of the statute will be violated as certainly as if the discrimination had been knowingly made. In our opinion this places too strict a construction upon the statute. Obviously, the assets of insurance companies must be preserved for the benefit of all, but the common good will not be harmed through occasional and inadvertent mistakes in the preparation of policies. Such errors occur but seldom, and will cause no substantial detriment; only when an insurance company deliberately enters upon a course of discrimination will

*"Section 1. Be it enacted, &c., That no insurance company organized under the laws of, or doing business in this Commonwealth, or any officer, agent, solicitor, or representative thereof, or any insurance broker, shall pay, allow or give, or offer to pay, allow or give, directly or indirectly, as inducements to insurance, nor shall any person knowingly receive, as such inducement to insurance,...... any special favor or advantage in the dividends or other benefits to accrue thereon,......or any valuable consideration or inducement whatever, not specified in the policy contract of insurance,......

"No life insurance company organized under the laws of, or doing business in, this Commonwealth, shall make or permit any distinc-

its reserves become depleted. It is against such intentional discrimination on the part of the company, and intentional acceptance of such preferential benefits by the insured, that the statute is aimed.

It is not only that the equities do not favor defendant in this case. On the contrary, there are positive equities in favor of appellant which would make us pause long before affirming this judgment.

When considering the respective equities, it should be noted that the policy was returned to defendant's home office on a number of occasions for the purpose of having changes of the beneficiary registered and in order to procure loans upon it. Defendant had numerous opportunities to discover its mistake. An inference of laches upon its part would be stronger than any inference that appellant should have known an error must have been made.

A policy of insurance is no longer an isolated contract to be laid away until it matures. It is well known that such policies are now regarded as a substantial form of capital. Their holders are encouraged to plan their contracts so as to make of them a present asset as well as an investment to be realized upon in the future; such contracts furnish a form of collateral security. If a policy-holder cannot rely upon the face of his contract, but must be continuously apprehensive of the fact that at the end of twenty years he may be told a mistake had been made in the amount of capital upon which he had come to rely, far more injury will result to the companies and the public than will be

tion or discrimination in favor of individuals, between insurants of the same class with equal expectation of life, in the amount or payment of premiums or rates charged for policies of life or endowment insurance, or in the dividends or other benefits payable thereon, or in any of the terms and conditions of the contracts it makes, nor shall any such company or agent thereof make any contract of insurance, or agreement as to such contract, other than as plainly expressed in the policy issued thereon......"

occasioned by requiring this defendant to stand the consequences of its own mistake.

The conclusions thus reached render it unnecessary for us to consider the other questions discussed in the briefs. We sustain the assignment charging error in entering judgment for the defendant n. o. v.

Judgment reversed and here entered in favor of appellant for $420, with interest from July 26, 1930.